NEW YORK HANDKERCHIEF MFG. CO.
v. NATIONAL LABOR RELATIONS
BOARD.

No. 7147.

Circuit Court of Appeals, Seventh Circuit.
July 11, 1940.

Writ of Certiorari Denied Nov. 18, 1940.

See 61 S.Ct. 171, 85 L.Ed. ——.

Charles L. Cohns, of Chicago, Ill., for petitioner.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Ruth Weyand, and Nanette Dembitz, Attys., National Labor Relations Board, all of Washington, D. C., for respondent.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition to review and set aside an order by the National Labor Relations Board (hereinafter called the "Board") against the New York Handkerchief Manufacturing Company, (hereinafter called the "petitioner") issued pursuant to Section 10 (c) of the National Labor Relations Act (49 Stat. 449, 29 U.S.C. § 151 et seq.). In its answer to the petition, the Board requested enforcement of its order.

The International Ladies Garment Workers Union, Local No. 76, (hereinafter called the "Union") having filed a petition with the Regional Director of the Board at Chicago, Illinois, alleging that a question affecting commerce had arisen concerning the representation of the petitioner's employees and requesting an investigation and certification of representatives pursuant to Section 9(c) of the Act, the Board, on December 21, 1937, authorized the investigation. As part of the investigation, a hearing was held on January 28, 1938, before a Trial Examiner, participated in by counsel for the Board, petitioner and the Union.

On February 28, 1938, the Board issued its Decision and Direction of Election, finding, among other things, the unit appropriate for the purpose of collective bargaining, that the question concerning representation could best be decided by a secret ballot election, and directing that such election be held. An election was conducted on March 24, 1938, during the hours of 3:00 P. M. to 6:00 P. M. Thereafter, the Regional Director issued an intermediate report setting forth various acts of interference and coercion by petitioner in connection with the

election; that approximately 225 employees were eligible to vote, of whom 56 voted; that 53 cast votes for the Union and recommended certification of the Union as the exclusive representative of all employees within the unit found appropriate. On June 1, 1938, the Board certified the Union as exclusive representative of the employees in such unit.

Predicated upon charges filed by the Union, the Board, on June 24, 1938, issued a complaint alleging that petitioner had refused to bargain collectively with the Union despite the latter's certification by the Board as the exclusive representative of all the employees in the unit found by the Board to be appropriate; that petitioner had discharged certain named employees and had decreased the amount of work of others because they had joined and assisted the Union; and, that by these and other acts, petitioner had engaged, and was engaging, in unfair labor practices in violation of Section 8(1), (3) and (5) of the Act. Petitioner filed an answer denying that the Union was the exclusive representative of the employees within the unit found appropriate; admitted that it had refused to bargain with the Union; admitted that it had discharged and decreased the work of the various named employees, but denied the commission of unfair labor practices within the meaning of the Act. A hearing was had before a Trial Examiner from June 30 to July 8, 1938, participated in by counsel for all interested parties. On September 15, 1938, the Trial Examiner filed an intermediate report in which it was found that petitioner had engaged, and was engaging, in unfair labor practices as charged in the complaint. On October 26, 1939, the Board rendered its decision setting forth its finding of fact, conclusions of law, and order.

The Board found that petitioner had committed the unfair practices as charged, but had not discriminated against all of the employees named in the complaint.[1] Petitioner was ordered to cease and desist from its unfair labor practices; was directed to bargain collectively upon request with the Union; to offer reinstatement with back pay to seven named employees;[2] to make whole two persons named Edwards and Jackson for any loss of pay suffered by reason of the discrimination against them; to make whole an employee named Lee for any loss of pay suffered between the date of the termination of his employment and the date when he secured other employment; and to make whole an employee named Harris for any loss of pay between the time of her discharge and the date of the commencement of the hearing.

The contested issues, as stated by petitioner, may be summarized briefly as, (1) there is no substantial evidence to sustain the findings of the Board that the petitioner committed unfair labor practices, and (2) that the Board was without authority to call an election for the purpose of determining a representative of the appropriate unit. Involved in issue 2 is the further question as to whether the result of the election as had was such as to justify the Board's conclusion that the Union was the representative of the employees.

As to issue 1, a study of petitioner's brief in connection with the record is convincing that its argument is predicated largely upon testimony favorable to it, and a comparison of such testimony with that favorable to the findings of the Board. In other words, we are asked to weigh the conflicting testimony and make findings contrary to those made by the Board. This we are not permitted to do by the express terms of the Act and by the generally accepted interpretation thereof. Considering the testimony favorable to the Board, with such reasonable inferences as may be drawn therefrom, we are of the opinion that the testimony adequately supports the Board's conclusion that petitioner was guilty of unfair labor practices as described in Sections 8(1) and (3). The conclusion with reference to section 8(5), subsequently considered, is dependent upon the authority of the Board to call an election, predicating upon the results thereof, its decision that

---

[1] In the complaint, 25 employees were named as having been discriminated against. As to 14 of these employees, the Board found there had been no discrimination, and as to them the charge was dismissed. As to some of these 14 employees, the order of the Board was contrary to the recommendation made by the Trial Examiner in his report.

[2] The order provided for a deduction from the amount otherwise due each of said employees monies received for work performed upon Federal, State, county, municipal or other work-relief projects and, that petitioner pay amounts so deducted to the appropriate fiscal agency of the governments which supplied the funds for said work-relief projects.

the Union was the representative of the employees.

In view of what we have said, there is no occasion to enter into a detailed analysis of the testimony. Briefly, it discloses that the Union commenced to organize in the fall of 1937. Shortly thereafter, upon refusal of petitioner to recognize the Union, the latter filed a petition with the Board for certification. Upon learning of this fact, the Secretary of petitioner, who was in charge of plant operations, called a meeting of all employees to whom he spoke for thirty to forty minutes on the subject of unionization. While it is contended by petitioner that the purpose of this meeting was to ascertain what Union, if any, the employees desired, it is plain that the real purpose was to warn the employees against joining the Union, and the inference is inescapable that it was the intention to intimidate and threaten those who were members or might become members. On different occasions, the Secretary sought to ascertain who were members and to point out to them that the Union was undesirable, against their welfare, and that petitioner would accord them better treatment if they were non-union. There was evidence to the effect that the employees were warned that if they joined or assisted in the Union they would be discharged, and that petitioner sought to prevent the distribution of Union literature outside the plant. The non-union attitude of petitioner is glaringly disclosed by its effort to prevent its employees from participating in the Board election, its refusal to post notices of the election, and its threats and intimidation plainly intended to prevent its employees from participating therein. Without relating in detail this testimony, it is sufficient to state that a reading of the same leaves us without doubt that its conduct in this respect was reprehensible.

■ Of the 11 employees found to have been discriminatorily discharged, six were discharged on the day following the election, and two discharged five days later. All of these eight employees had participated in the election. Several of them were told by their forelady at the time of their discharges that the company did not have work for "voters." Petitioner contends that these discharges were the result of an unusual decline in production in the spring of 1938. Such a decline is not disputed, but it does not follow that the discharges were occasioned thereby. In fact, the record indicates that prior to the election, a decline in production was followed by a division of work rather than by a discharge of some of the employees. The instant discharges were a departure from the custom followed by petitioner theretofore. The fact that these discharged employees had been active in the Union, had participated in the election contrary to the wishes of petitioner and that at least some of them were told petitioner had no work for "voters," affords ample support for the Board's finding that they were discriminated against in violation of the Act. Two other employees, namely White and Bramblett, found to have been discriminatorily discharged, had been employed by petitioner for many years, and both had been active in the affairs of the Union. It is contended by petitioner that they were discharged for inefficiency, and there is evidence which supports this contention. It is significant, however, to note that their inefficiency apparently was not discovered until they cast their lot with the Union. Taking into consideration petitioner's hostility toward the Union and the employees connected generally therewith, we cannot say that the Board's conclusion respecting these two employees is unreasonable or not supported by substantial evidence.

■ Another employee, James Lee, found to have been discriminatorily discharged, was also active in the affairs of the Union, and participated in the election. It is contended by petitioner that he was discharged because he refused to do certain work assigned him. The evidence in support of petitioner's contention is not convincing and is denied by Lee. Again we think the Board's conclusion should not be disturbed.

■■ All of the 11 employees found to have been discriminatorily discharged were ordered made whole from the time of such discharges until an offer of reinstatement was made except James Lee and Ruth Harris, the former until the time when he began work for the Works Progress Administration, and the latter until the date of the hearing. The testimony shows that Lee, after his discharge, secured employment with the W.P.A. at a compensation greater than what he was receiving from petitioner. It is shown that Ruth Harris obtained employment in a restaurant and, at the time of the hearing stated she did not desire to be re-employed by peti-

tioner. We think the order of the Board with reference to back pay as to these two employees was proper.

█ It is contended by petitioner that reinstatement was offered the employees in question in the latter part of May, 1938, and, therefore, in any event, they should be made whole only up to that date. The Board found, however, and we think properly so, that no offer of reinstatement was made at that time. Petitioner relies upon a carbon copy of a letter which supposedly was mailed to the employees at that time requesting their return to work. There was no proof, however, as to who wrote the letter or whether or not it was actually mailed to any of such employees. All of the employees in question denied receiving such a letter or offer of reinstatement, and there is no occasion to disturb the finding of the Board in this respect.

█ We now come to contested issue 2, which challenges the authority of the Board to call the election and to utilize the result thereof in determining that the Union was the representative of the employees. As already stated, a petition was filed with the Board by the Union containing appropriate allegations requesting an investigation and certification pursuant to Section 9(c) of the Act. A hearing was held and an election ordered and had. A decision was rendered by the Board finding the appropriate unit, and that the Union was the proper representative of a majority of the employees of such unit. Petitioner, as we understand, argues that the Board was without authority to make the investigation provided by Section 9, for two reasons: (1) There was no labor dispute, and (2) there was no showing that the Union represented a majority of its employees. As to the first reason, we find nothing in the Act which requires the existence of a labor dispute prior to the initiation of a proceeding under Section 9, but even if such is required, there was a controversy concerning representation which is made a labor dispute by Section 2(9) of the Act. We do not understand petitioner's argument that there was no showing of a majority. Clearly, the Act does not contemplate such a showing—in fact, that is one of the matters to be determined in a proceeding under Section 9. Petitioner evidently is confused with a proceeding under Section 10, where it must, of course, be shown that the Union represents a majority before the employer can be found guilty of

an unfair labor practice in its refusal to bargain.

█ Petitioner also argues that the Board was without authority to certify the Union as the representative of its employees for the reason that those who participated in the election and voted for the Union represented less than a majority of the employees. The total number of employees eligible to vote was about 225, of whom 56 voted. Fifty-three of those voting were favorable to the Union, and three opposed. The authority of the Board to certify the Union under such circumstances presents an important question, not free from doubt. In this connection, it must be kept in mind that we have sustained the Board's finding to the effect that petitioner was guilty of coercion and intimidation against its employees, which, no doubt, prevented many of them from participating in the election. There is no question raised but that the Board found the appropriate unit, and no denial that petitioner refused to bargain with the Union after the Board's certification, based upon such election. The specific question then is: Can the Board utilize an election participated in by less than a majority of the employees of the appropriate unit as the basis for certification that the Union represents a majority of the employees of such unit?

The Board argues that its construction accords with the plain language of the Act and also with the decision in Virginian Ry. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, construing a similar provision of the Railway Labor Act, 45 U.S.C.A. § 151 et seq. We are not as confident concerning the plain language of the Act as is the Board, but we agree that the decision of the Supreme Court in the case just cited furnishes strong support to the Board's contention. The act under consideration provides that the "representatives designated or selected * * * by the majority of the employees" in an appropriate unit shall be the exclusive collective bargaining representatives of all the employees in such unit, and that "whenever a question affecting commerce arises concerning the representation of employees, the Board may investigate such controversy, and certify * * * the name * * * of the representatives that have been designated or selected." The Act then states "and may take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives."

Section 9(a) and (c). The Railway Labor Act provides that "the majority of any craft or class of employees shall have the right to determine who shall be the representative." Then follows a provision that "if any dispute shall arise * * * as to who are the representatives of such employees * * * it shall be the duty of the Mediation Board * * * to investigate such dispute and to certify * * * the name" of such representative. It then authorizes the Board "to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives * * *." 45 U.S.C.A. § 152.

From a comparison of the language of the two Acts, it becomes evident that the Labor Board is given precisely the same authority under the Labor Act as is the Mediation Board under the Railway Labor Act. In the Virginian Railroad Company case, the court construed the provision above quoted in a case where the Union failed to receive a majority of the ballots of those eligible to vote, although a majority of the craft participated in the election, and approved the decision of the Mediation Board certifying the Union as the representative of such employees, such certification having been predicated upon the result of the election. The court, on page 560 of 300 U.S., on page 605 of 57 S.Ct., 81 L.Ed. 789, said: "* * * It is to be noted that the words of the section confer the right of determination upon a majority of those eligible to vote, but is silent as to the manner in which that right shall be exercised. Election laws providing for approval of a proposal by a specified majority of an electorate have been generally construed as requiring only the consent of the specified majority of those participating in the election. [Citing cases.] Those who do not participate 'are presumed to assent to the expressed will of the majority of those voting.' [Citing cases.]"

The court then points out that otherwise "an indifferent minority could prevent the resolution of a contest, and thwart the purpose of the act, which is dependent for its operation upon the selection of representatives. There is the added danger that the absence of eligible voters may be due less to their indifference than to coercion by the employer." This provision of the Railway Labor Act has been similarly construed in

Association of C. E. etc., v. Brotherhood of Railway & S. S. C., 7 Cir., 85 F.2d 152, 109 A.L.R. 345, and Nashville, C. & St. L. Ry. v. Railway Employees' Dept., etc., 6 Cir., 93 F.2d 340. It is to be noted, of course, that in all these cases, a majority of the employees participated in the election, while in the instant case the number who participated was far less than a majority. In those cases, as here, however, the number who voted in favor of the Union was less than a majority. We are of the opinion that such distinction does not alter the rationale of those decisions, especially in view of the fact that they are predicated upon the rule governing political elections where the result is determined by a majority of those participating, and irrespective of the number entitled to vote in the election. Therefore, we are of the opinion that the Board had the authority to make the certification based upon the result of the election.

It does not follow, however, that the Board could justify itself in the exercise of such authority in every case regardless of the number who participated in the election. Like any other authority, it must not be employed arbitrarily. In the instant case, as found by the Board, petitioner, by its unlawful conduct, interfered with the right of its employees to participate in the election and, no doubt, was responsible for the small proportion of its employees voting. Under such circumstances, we are of the opinion that the Board not only was within its authority, but was justified in concluding that the Union was the proper representative. To hold otherwise would place a premium upon the unlawful conduct of an employer and enable it to frustrate one of the major purposes of the Act—that is, the determination of a proper bargaining agent.

Petitioner refused to bargain with the Union subsequent to the Board's certification, and the Board's finding of guilt as to Section 8(5) was predicated upon such refusal. We concur in the Board's finding in this respect.

As stated heretofore (footnote 2) the Board's order directs petitioner to reimburse any governmental agency for moneys paid to employees found to have been unlawfully discharged. We have, in the case of Stewart Die Casting Corporation v. Labor Board, 7 Cir., 114 F.2d 849, decided July 3, 1940, concluded that the

Board is without authority to impose such a requirement. It would serve no good purpose to repeat what we said in that case, or further discuss the question.

The petition to review and set aside the order of the National Labor Relations Board is denied and the petition of the Board for an order of enforcement is allowed, the order to be modified in conformity with the suggestion last above mentioned.