## NATIONAL LABOR RELATIONS BOARD v. ARMOUR & CO.

### No. 3098.

Circuit Court of Appeals, Tenth Circuit.

Nov. 5, 1945.

On Rehearing Jan. 8, 1946.

Rehearing Denied May 9, 1946.

---

572

Malcolm F. Halliday, Associate Gen. Counsel, National Labor Relations Board, of Washington, D.C. (Alvin J. Rockwell, Gen. Counsel, and Ida Klaus and William F. Scharnikow, Attys., National Labor Relations Board, all of Washington, D.C., on the brief), for petitioner.

Paul E. Blanchard, of Chicago, Ill., and Kenaz Huffman, of Denver, Colo. (Sherman A. Sutliff, of Denver, Colo., on the brief), for respondent.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a proceeding to enforce against Armour and Company[1] an order of the National Labor Relations Board.[2]

The Board found that Armour in the operation of its meat packing plant in Kansas City, Kansas, violated § 8(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3, 5)[3] by questioning its employees concerning their concerted activities; by discharging its employees Cornforth, Cowger, and Donahue because of their membership in, and activities on behalf of, the Packinghouse Workers Organizing Committee;[4] and by refusing to bargain collectively with the Union as the exclusive bargaining agent in an appropriate unit of its employees, consisting of its plant clerks at such packing plant. The order requires Armour to cease and desist from the unfair labor practices found; to offer reinstatement with back pay to the three employees it discharged; to bargain collectively with the Union upon request; and to post appropriate notices.

On December 17, 1942, the Union, which then represented the production and maintenance employees at such packing plant, filed a petition with the Board for investigation and certification of representatives of the plant clerks pursuant to § 9(c) of the Act, 29 U.S.C.A. § 159(c). At the hearing on the petition, Armour refused to take any position as to whether the plant clerks constituted a separate and distinct appropriate bargaining unit, but contended that since the plant clerks had access to confidential information, they were "essentially a part of the management" and should not be represented by the same Union as, or included in the same bargaining unit with, the production and maintenance employees. Upon consideration of the evidence adduced at the hearing, the Board found the plant clerks constituted a unit appropriate for the purposes of collective bargaining, and directed that an election be held. At the election held on June 9, 1943, the Union received 16 votes out of a total of 26 cast. Three votes were cast against representation by the Union and seven votes were challenged. Armour refused to furnish the Board with a payroll list of the plant clerks who were eligible to vote. Each of the 19 unchallenged votes which the Board counted was cast by a person whose iden-

---

[1] Hereinafter referred to as Armour.
[2] Hereinafter referred to as the Board.
[3] Hereinafter referred to as the Act.
[4] Hereinafter referred to as the Union.

tity as an employee within the unit was established both by his affidavit and by the presence of his name on a list of plant clerks previously submitted by Armour in the representation case. All the plant clerks on such list were still employed at the time of the election, except one who did not vote at the election. No new plant clerks had been hired.

On June 16, 1943, the Regional Director filed his report of the election, which was duly served upon Armour. On June 24, 1943, no objection to the conduct of the election having been filed by Armour, the Board certified the Union as the exclusive bargaining representative of such plant clerks.

On August 31, 1943, Armour rejected the Union's request for a bargaining conference on behalf of the plant clerks. The Union thereupon filed charges under § 10 (b) of the Act, 29 U.S.C.A. § 160(b); and the Board filed a complaint charging Armour with the unfair labor practices referred to above. At the hearing on the complaint, Armour admitted its refusal to bargain, but contended that its plant clerks are not employees within the meaning of the Act and not eligible to belong to any bargaining unit.

The plant clerks are a cohesive group, allied as to their bargaining interests by the similarity of their functions and working conditions. They perform clerical work, but no manual labor, in the various production and maintenance departments of the plant. They are immediately supervised by the respective foremen to whose departments they are assigned, but they are subject to the general supervision of the plant's office manager. The plant clerks collect and tabulate departmental data which is transmitted to Armour's local office and to its main office in Chicago for cost and general accounting purposes. They prepare initial departmental records and reports concerning production, stock, supply inventories, gain and shrinkage, interdepartmental transfers of products and shipments, and, in some instances, the number of hours worked by production employees. The nature of their work makes available to them considerable information concerning the operation of Armour's business. For the most part this consists of meat-curing formulae, statistical results of operations, data on the efficiency of the departments, labor rates, inventories, unit cost figures, volume of shipment, and price of goods sold. These facts are of such a nature that Armour does not wish them to be disclosed to its business competitors. Plant clerks also have access to the wage rates, work standards, and seniority records of the production and maintenance employees. In a small department the duties of the plant clerk are performed by the foreman of such department. In the larger departments such duties are performed by a plant clerk or clerks under the supervision of the foremen. There are times when the management directs a test run of a small group where no regular foreman is present. In those cases the plant clerk is directed to supervise the gang during the test run. The plant clerk keeps an accurate account of personnel who enter his department for the purposes of seniority. When there is a reduction in the department, the plant clerk notifies the foreman the employees who are to come out, and when there is an increase in the department, the employees that are to be called, in accordance with seniority. But plant clerks have no power to hire, to discharge, to promote or demote, or even to make recommendations with respect thereto. Their reports concern efficiency in the respective departments as shown by the quantity produced by each department as a whole. They do not reflect either the quantity or quality of the work of individual employees.

When a grievance is presented, as, for example, that a job is overloaded, the plant clerk gathers the information pertaining to that grievance, presents it to the foreman, who reviews it and then sends it on to the operating superintendent or to the man designated by the management for the handling of that grievance. The information thus gathered by the plant clerk is in no sense confidential. Armour is required to disclose such information to the Union under the bargaining contract with production and maintenance employees. Likewise, the seniority records, which the plant clerks keep and to which they have access, are not confidential. Seniority lists are posted in each department.

It follows that the plant clerks' confidential information is confined to those matters which Armour does not wish to disclose to its business competitors.

■ Section 2 of the Act, 29 U.S.C.A. § 152, in part reads:

"(2) The term 'employer' includes any person acting in the interest of an employer, directly or indirectly, * * *.

"(3) The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the chapter explicitly states otherwise, * * *."

The foregoing definitions are not mutually exclusive. ·For example, a foreman, in his relation to his employer, is an employee within the meaning of the Act, and in his relation to the laborers under him he is the representative of the employer and is, therefore, an employer under the Act.[5]

■ The term "employee" was not used by the Congress as a word of art. It is to be given a broad and comprehensive meaning. It takes color from its surroundings and should be read in the light of the mischief to be corrected and the end to be attained.[6]

■ It is a well-known fact that at the time of the passage of the Act mental or white-collar workers, because of lack of organization, wielded little bargaining power in dealing with their employers as to wages, hours, or other working conditions. In that respect the manual workers enjoyed a more advantageous position. We entertain no doubt that Congress, when it passed the Act, intended to recognize and protect the organizational and bargaining rights of the vast number of employees falling in the classification of mental or white-collar workers.

In Eagle-Picher Mining & Smelting Co. v. National Labor Relations Board, 8 Cir., 119 F.2d 903, 911, the court held that a graduate chemist, acting as director of research for the mining company, was an employee protected by the Act.

The Board has repeatedly issued enforcement orders relating to clerical and other non-manual workers, which have been enforced by the courts.[7]

■■ The question remains whether the duties performed by the plant clerks are of such a nature as to exclude them from the term "employee" or to make it improper for them to be represented by the Union. The mere fact that the objective of the duties they perform is to increase plant efficiency and benefit the employer does not exclude them from the term "employee." Any employee who serves faithfully benefits his employer. Certainly, exclusion from the benefits of the Act is not the price of honest and faithful service. It is true that the knowledge which the plant clerks obtain is of a highly confidential nature and that its disclosure to competitors of Armour might result in injury to Armour. But, we do not think those facts take the plant clerks outside the term "employee." Armour may require, as a condition of employment, that the plant clerks treat such information as confidential. The knowledge of the plant clerks with respect to seniority of employees and the knowledge the plant clerks acquire with respect to grievances is not confidential. The seniority lists are posted in each department and are available to the Union and, under the Union's contract with Armour, the results of the plant clerks' investigations of labor grievances must be disclosed to the Union.

■ Undoubtedly, improvement in labor relations will result if the facts which condition a controversy are fully disclosed and bargaining is conducted in the light of those facts. The purpose of the Act is to promote fair and just settlement of disputes by peaceful processes and to prevent industrial warfare with its harmful repercussions upon employer and employee and the general public.

It is true that the Board in the Matter of Maryland Drydock Company, 49 N.L.R.B. 733, held that supervisory employees should not be certified as collective bargaining units and represented by the same organization which represents their subordinates. But this was because of the commingling of management and employee functions in supervisory employees.[8] But, here, the

[5] National Labor Relations Board v. Skinner & Kennedy Stationery Co., 8 Cir., 113 F.2d 667, 670, 671.

[6] National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 124, 64 S.Ct. 851, 88 L.Ed. 1170; Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 190, 192, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; United States v. American Trucking Associations, 310 U.S. 534, 545, 60 S.Ct. 1059, 84 L.Ed. 1345.

[7] Associated Press v. National Labor Relations Board, 301 U.S. 103, 129, 57 S.Ct. 650, 81 L.Ed. 953; National Labor Relations Board v. Bank of America Nat. T. & S. Ass'n, 9 Cir., 130 F.2d 624; National Labor Relations Board v. Clarksburg Publishing Co., 4 Cir., 120 F.2d 976; Aluminum Ore Co. v. National Labor Relations Board, 7 Cir., 131 F.2d 485, 486, 147 A.L.R. 1; National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930.

[8] In that case the Board said:

"We are not unmindful of the argument

plant clerks are in no sense supervisory employees. They have no power to hire, to discharge, to promote or demote, or even to make recommendations in these respects. They play no part in the formulation of Armour's labor policy, and handle no personnel matters or labor disputes. Their duties with respect to labor relations are purely clerical and are performed under the supervision of their immediate superiors.

■ Hence, we conclude that the plant clerks are employees within the meaning of the Act and may appropriately be represented by the Union as their bargaining agent.

Counsel for Armour contend that because the Board, in designating the appropriate unit for plant clerks, failed to exclude supervisory employees, who in small departments act as plant clerks, the unit is to be deemed to include such employees and is consequently improper, and that an erroneous recital in the Board's election report that there were 37 eligible voters rather than 30, the correct number of plant clerks actually employed by Armour, demonstrates the irregularity and invalidity of both the election and certification.

■ As the Board pointed out, its finding of unit clearly described a group of employees known as plant clerks because of the type of work they perform, and not a unit consisting of any particular persons or any definite number of persons. Number

was not an element in the description of the unit. Moreover, the finding of a unit consisting of plant clerks could not conceivably be construed as having been intended to include supervisory employees in view of the Board's established policy to the contrary.[9]

■ The election showed the Union to be the choice of the majority of the employees in the unit. Neither the vote of the only supervisory employee who cast a vote, nor the Regional Director's miscalculation of the number of persons eligible to vote, affected the outcome of the election, for, with the exclusion of the two supervisory employees who appeared on Armour's list as plant clerks and the resignation of one clerk before the election, the remaining 27 persons on Armour's list of plant clerks actually composed the bargaining unit. At most, the number of votes cast at the election in favor of the Union would be reduced from 16 to 15, all cast by persons whose eligibility was reliably attested to by their affidavits and the presence of their names on Armour's list of plant clerks. Clearly, therefore, the Union polled a majority of the votes cast by eligible voters at the election.[10]

On August 2 or 3, 1943, a number of clerical employees in Armour's Industrial Engineering Department, a group distinct from the plant clerks, attended an organizational meeting of the Union. Among

advanced by counsel for the Union that the development of mass production industry has stripped foremen of much of the plenary authority and managerial discretion which was theirs in an earlier day. Nor are we unaware that the impetus toward foremen organizations stems largely from a desire to reestablish the bargaining power of foremen commensurate with the growth of employee self-organization. Likewise, it may be conceded that the position of supervisors would be improved if the provisions of the Act were extended to facilitate collective bargaining by these groups. We are now persuaded that the benefits which supervisory employees might achieve through being certified as collective bargaining units would be outweighed not only by the dangers inherent in the commingling of management and employee functions, but also in its possible restrictive effect upon the organizational freedom of rank and file employees. It is not necessary to elaborate at length on either of these points.

"The very nature of a foreman's duties make him an instrumentality of manage-

ment in dealing with labor. The duty of supervision with which he is principally charged implies a delegation of authority with respect to the selection, promotion, and discharge of the workers in his section. * * * To hold that the National Labor Relations Act contemplated the representation of supervisory employees by the same organizations which might represent the subordinates would be to view the statute as repudiating the historic prohibition of the common law against fiduciaries serving conflicting interests."

[9] Matter of Maryland Drydock Company, 49 N.L.R.B. 733, 744; National Labor Relations Board, Third Annual Report, 1938, pp. 180-183; National Labor Relations Board, Fourth Annual Report, 1939, pp. 93, 95; National Labor Relations Board, Fifth Annual Report, 1940, p. 70, and cases therein cited.

[10] See Virginian R. v. System Federation No. 40, 300 U.S. 515, 560, 57 S.Ct. 592, 81 L.Ed. 789; New York Handkerchief Mfg. Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 144, 148, 149.

them were employees Cornforth, Cowger, and Donahue. Cornforth and Donahue were employed as checkers and Cowger as a cost clerk. On August 9, Campbell, General Superintendent of Armour's plant, summoned the employees in the Industrial Engineering Department and read them a prepared statement. Campbell first referred to the fact that some of them were giving consideration to becoming members of a labor organization. He then explained that Armour's employees were divided by law into two well-defined groups of employees—a production group and a management group—and that because their duties were of a confidential nature, the employees of the Industrial Engineering Department were clearly within the management group who take part in the direction of the business and in varied degrees act for the management in carrying out the management policy as to those within the production group. Campbell then stated that "We will not permit management employees in the Industrial Engineering Group to become members of a labor organization, and at the same time retain their present status as management representatives." He then advised the employees that each of them must make a choice or election between Union affiliation and his job in the Industrial Engineering Department, and that if an employee chose Union affiliation, he would be transferred to production work. Some of the employees told Campbell they did not want to join the Union. Cornforth, Cowger, and Donahue, after discussing the matter among themselves, concluded they were not strong enough to resist and informed Campbell that in order to keep the jobs they then held, they would not join the Union. Nevertheless, Cornforth, Cowger, and Donahue attended a meeting of the Union on August 16, 1943. On August 17, Campbell informed Cornforth, Cowger, and Donahue that since they had persisted in their Union activities, their transfers to production jobs would become effective the following day. He told Donahue that he would thereafter work as a common laborer in the smokehouse, a job which paid 70 cents an hour, in contrast with the 95 cents an hour Donahue was then being paid. He told Cowger that his production job was to be in the box shop at 70 cents an hour, as compared with the 82½ cents an hour he was then receiving. He did not tell Cornforth what production job she was to fill,

but it was apparent to her that it would be at a reduced wage. Her wages were 62½ cents an hour and the wages for women in the plant were 59 cents an hour.[11] Cornforth, Cowger, and Donahue refused to accept the transfers and left the plant under Campbell's instructions. Campbell notified each of them by registered letter that Armour was holding a position open for them in the plant, but he referred to production work and not to their former employment.

The function of the Industrial Engineering Department is to show how efficiently the plant is operated when judged by Armour's standards, which include not only time standards, but also job descriptions prescribing the methods and number of employees to be used in performing most of the production operations. The three phases of the work in such department, that is, setting time standards, checking, and computation, are performed by time-study men, checkers, comptometer operators, and cost clerks. Since Cornforth and Donahue were checkers and Cowger a cost clerk, we are concerned only with the status of employees in those two classifications.

The checkers are fact-finding employees who compile weekly reports setting forth the production figures, the standards, the number of man hours worked, and the time allowances for day work in each of the departments assigned to them. Their procedure is to copy these figures from the daily production reports of the plant clerks, using identical daily forms, and then to assemble them in weekly form for the use of the division heads as well as the comptometer operators and cost clerks. In addition to compiling these reports, the checkers visit the departments assigned to them to discuss with the foremen and plant clerks any apparent errors in the figures in the plant clerks' reports and to spot check the performance of the various operations against the job description, both as to method and number of men employed. Spot checking is done as a matter of routine and also on special instructions of the Assistant Superintendent in charge of the Industrial Engineering Department when weekly reports show a low efficiency in particular production departments. In the course of this work, the checkers call the foremen's attention to any deviations from job descriptions or standards, discuss with the foremen the time allowances for day work, and may make suggestions to the foremen

---

11 Certain women in the production department, however, received 62½ cents an hour.

as to more efficient ways of performing a job. Their functions in these respects, however, are purely advisory and decision as to what action, if any, to be taken is left to the foremen or division heads.

The cost clerk's job is purely clerical. He posts plant clerks' and checkers' labor figures on account sheets, known as spread sheets, allocating the total labor costs to department classifications meeting Accounting Department requirements. He deals with labor costs only in terms of man hours and not in terms of dollars and cents. His knowledge of wage rates extends merely to those of foremen and plant clerks and not to those of the rank and file production employees.

The checkers and cost clerks exercise no supervisory functions. They have nothing to do with labor policies or labor relations. They can neither hire nor discharge, nor make any recommendations with respect thereto. Their reports deal with the production department and gangs as units and do not disclose individual efficiency or inefficiency, except in cases where operations are performed solely by a single employee.

What we have said with respect to plant clerks applies equally to checkers and cost clerks.

 It follows that the Board properly found that Cornforth, Cowger, and Donahue were discriminately discharged.

 The order directed Armour to make Cornforth, Cowger, and Donahue whole by payment to each of them of a sum of money equal to that which he or she would have normally earned as wages from August 17, 1943, the date of the discriminatory discharge, to the date of the offer of reinstatement, less his or her net earnings during such period. Counsel for Armour contend that credit should be allowed for the earnings such employees would have earned at the jobs offered to them by Armour. They predicate this contention on the following statement of the Supreme Court in Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 198, 61 S.Ct. 845, 854, 85 L.Ed. 1271, 133 A.L.R. 1217: "Since only actual losses should be made good, it seems fair that deductions should be made not only for actual earnings by the worker but also for losses which he willfully incurred." But such employees were not required to submit to the discrimination as the price for Union affiliation. They were in effect discharged from the jobs they were entitled to hold. Under the circumstances, their refusal to accept the discriminatory jobs was not willful. While they should be charged with earnings actually received and with earnings not received because of the unjustifiable refusal to take desirable new employment, they should not, in our opinion, be charged with the earnings they would have received at the discriminatory jobs proffered them.

The Board found that Armour also violated § 8(1) of the Act by questioning employees in the sales department office concerning their circulation of a Union petition. That finding is supported by substantial evidence. In June, 1943, 15 or more employees in the sales office signed a petition indicating their interest in a Union of office employees. While Cane, one of the signers, had the petition on his desk, he was summoned by General Plant Sales Manager Elder. Elder told Cane that Armour had no objection to the employees joining a Union, but, referring to the circulation of the petition, said, "I can fire you for this, but I won't. I want to find out what your difficulties are." Shortly thereafter, Thompson, Office Manager of Armour, asked Cane and two other employees to show him the petition and to explain why it was being circulated. Upon reading the petition, Thompson commented that many of the subscribers were new employees and referred to the fact that it was also signed by some of the older employees, whom he said it would be Armour's normal policy to take care of and retain when the new employees lost their jobs.

At about the same time, Cerf, Armour's Sales Manager, inquired of Cane with respect to the petition and stated, "He was kind of lost because it started in his department, and he didn't know a thing about it until * * * somebody else mentioned it to him."

 The Board was warranted in concluding that such actions by Armour's representatives constituted an interference with and a restraint upon the freedom of the employees to exercise the rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157.

Section 1(c) of the order reads: "In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their

own choosing and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act."

Counsel for Armour urge that this broad order was not justified and cites in support of their position, National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. But, in that case, there was no violation of § 7 other than a technical violation of § 8(1), which in terms incorporates, by reference, all the rights enumerated in § 7. In the instant case, there was an interference with the rights guaranteed by § 7 and for that reason we think § 1(c) of the order was proper.

The petition for enforcement of the order is granted.

### On Petition for Rehearing.

A further consideration of the blanket provisions of paragraph 1(c) of the cease and desist order in the light of the decision of the Supreme Court in May Department Stores Company v. National Labor Relations Board, 66 S.Ct. 203, and the facts presented on this record leads us to the conclusion that such paragraph of the order should be eliminated.

Armour's refusal to bargain with the representative of the plant clerks' bargaining unit was based on its good faith contention that the plant clerks did not constitute a legitimate bargaining unit. Likewise, the transfer of Cornforth, Cowger, and Donahue to employment where they would not have access to confidential information was predicated on the good faith contention that clerical employees having access to confidential information of Armour were a part of management and should be classified as employers rather than employees.

■ We held contrary to such contentions, but we entertain no doubt that as to both Armour acted in good faith and did not intend to violate the National Labor Relations Act. There is nothing in the record to justify the conclusion that Armour entertains an attitude of opposition to the purposes of the Act. As stated by the Supreme Court in National Labor Relations Board v. Express Publishing Company, 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930, "To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past."

■ Paragraph 1(c) of the cease and desist order should be stricken and in lieu thereof there should be inserted: "1. (c) from making inquiry of its employees with respect to their concerted activities for the purpose of collective bargaining or other mutual aid or protection."

■ In its petition for rehearing, Armour requests us to construe the phrase "substantially equivalent positions" in paragraph 2(b) of the order requiring it to offer to Cornforth, Cowger, and Donahue reinstatement "to their former or substantially equivalent positions" as not embracing positions that will give such former employees access to operating and production costs. It asserts that Cowger, if restored to his former position, will possess detailed information as to Armour's operating and production costs, and that Cornforth and Donahue will possess detailed information of job standards, rates, and overheads from which costs can be accurately computed. The character of the work performed by such former employees is fully stated in our former opinion. In that opinion we held that, notwithstanding such employees in the course of their employment acquired confidential information with respect to Armour's business, they were employees and were entitled to be members of a union. It is our opinion that the fact that such former employees belong to the union and, if restored to their former positions, will acquire confidential information respecting Armour's operating and production costs will not justify a refusal to reinstate them to their former positions. However, Armour may impose as a condition of continued employment that they do not disclose such information to third parties; and it may offer them reinstatement to other positions which are, in fact, substantially equivalent to their former positions as to wages, character of work, hours, and other terms and conditions of employment.

With respect to the other contentions raised on the petition for rehearing, we adhere to the views expressed in our former opinion.

The order will be modified as indicated above, and, as modified, will be enforced. The decree heretofore entered herein will be modified accordingly.