**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DEUTSCH COMPANY, Respondent.**

**DEUTSCH COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 15889.

United States Court of Appeals
Ninth Circuit.

April 8, 1959.

Jerome D. Fenton, General Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Fannie M. Boyls, Irving M. Herman, Attorneys, N. L. R. B., Washington, D. C., for N. L. R. B.

Coyle & Cooper, Leon M. Cooper, Los Angeles, Cal., for Deutsch Co.

Before FEE, CHAMBERS and BARNES, Circuit Judges.

BARNES, Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board issued against the respondent company on September 14, 1957. The NLRB had jurisdiction in this matter because respondent engages in interstate commerce in the manufacture of aircraft parts and components. This Court has jurisdiction of the petition for enforcement under § 10(e) and (f) of the National Labor Relations Act.[1]

The Board's order here rests on its finding that respondent, in violation of § 8(a) (1) and (5) of the Act,[2] refused to bargain with the union duly certified by the Board as the representative of employees of respondent in a single two-plant unit found by the Board to be appropriate. Denying the charge of un-

lawfully refusing to bargain, the company raises these principal defenses: (1) that the Board abused its discretion in finding a single two-plant unit rather than separate plant units to be appropriate; (2) that the election proceedings conducted by the Board were irregular; (3) that a private election conducted at one of the plants subsequent to respondent's refusal to bargain in the unit certified by the Board showed that a majority of the employees at that plant did not desire the union to represent them; and, (4) the union, by agreeing to the private election and participating therein, waived its right to represent the employees under the Board's certification.

## I. Facts

On March 28, 1956, the union filed a petition with the Board requesting certification as the bargaining representative of the single unit comprising all of respondent's production and maintenance employees. These employees included those at both the respondent's Avalon Boulevard and Regent Street plants. The company took the position that the two plants should constitute two separate bargaining units. Two other unions intervened but took no firm position either way, although willing to accept the unit desired by the petitioning union.

On the question of the bargaining unit, the Board found, and the testimony adequately substantiates, that the appropriate unit was a two-plant or company unit. The specific facts relied on are essentially those based on a finding of "centralized administration and functional integration of the two plants, the similar skills of the employees, and the uniform personnel policy" of the company. The Board made it clear, however, that "a separate unit at each plant *could* be appropriate for collective bargaining." The company contends that there is a substantial difference between the items produced by the two plants, that the type of assembly work is different, and that

**1.** 61 Stat. 147–149 (1947), 29 U.S.C.A. § 160(e) and (f) as amended.

**2.** 61 Stat. 140–141 (1947), 29 U.S.C.A. § 158(a) (1) and (5) as amended.

the composition of the personnel at the two plants differs significantly, and that there is no uniform personnel policy with respect to the two plants. While it is possible to have found from the record that the first three of the company's contentions are true, the last contention is clearly unwarranted by the evidence. In any case, the points made by the company could or could not be taken as true, and the outcome would be the same.

An election was scheduled for August 8, 1956. On July 24, 1956, respondent filed a motion with the Board for a rehearing and reconsideration of its decision as to what was the appropriate unit, asking for a suspension of the election until the points raised were determined, and to permit the respondent to present further evidence, and other points. The principal contention in the petition seems to have been that the Board's determination was contrary to other similar cases, and that insufficient evidence was taken to justify its determination. This petition was denied by the Board on August 2, 1956, "for the reason that it presents no issues which were not previously considered by the Board." Somehow, this denial of the petition failed to reach respondent company until August 10, 1956. The copy of the Board's denial received by the company bore the notation "Delay due to GSA error not National Labor Relations Board." However, respondent admittedly had notice on more than one occasion between August 2nd and August 8th that the election would be held on the appointed day. A company officer conceded that he also "may have" been specifically advised that the motion had been denied.

The election was held on August 8, 1956, as scheduled. At the Avalon plant, because of respondent's refusal to permit the use of its premises for the election, polling booths were set up by the Board officials on the sidewalks outside the plant. Two hundred thirty of the approximately 460 employees eligible at both plants voted in the election—207 in favor of the union. *None of the parties at any time filed objections to the conduct of the election* (although the rules of the Board require that this be done in five days), and on August 20, 1956, the union was duly certified as the bargaining agent by the Board.

Following several telephone communications between the parties, the union's secretary-treasurer, Doria, wrote to the company on September 14, 1956, asking that a date be selected to commence negotiations for a contract covering the two plants. The company notified the union that all negotiations should be carried on through H. Devoe Rea & Associates, its designated representative. A meeting was held on September 26, 1956. At this meeting Rea of the above named firm apparently announced that it was the company's position that the Board election was invalid, that the election did not represent the desires of the employees, and that the union had therefore been improperly certified. He further indicated that the company was not going to engage in collective bargaining until the question of the bargaining unit was worked out. Rea agreed to see what the company intended to do on this issue. There was also some discussion of the problems between the company and the union but little more than that, and the statements of Rea noted above.

The Board's position is that the company refused to bargain collectively, but wanted to bargain only on the issue of the appropriate bargaining unit, and proper representation by the union. The company contends that it did bargain, but since the election was "invalid" it only bargained as far as it properly could. In any event, after considerable haggling, the union and the company agreed to conduct a private election at the Avalon plant to determine the employees' sentiments on the question of the union representing them. This agreement provided that if the union won, the company would bargain without further objection to the Board's unit finding; but that if the union lost, the union would refrain from any strikes or related pressure and the company would

refrain from any anti-union activity "until the question of representation is tested and determined by the circuit court of appeals." In the meantime, Aiken, of the Rea Firm, admitted in a letter to the Board's regional office that the company had refused to collectively bargain, but that it was justified by the invalidity of the Board's certification. All through its brief the company takes the position that the vote or private election at Avalon was the union's idea, while the Board asserts that the company forced the union into this election since the company refused to bargain until this issue was settled.[3] The Avalon vote resulted in a vote of 169 to 137 against the union. After the election, the parties again met and respondent company refused thereafter to discuss any contract covering the Avalon employees, and it was agreed that further negotiation was futile.

Upon the foregoing facts, the Board, affirming the trial examiner, concluded that the company had refused to bargain with the union in violation of § 8(a) (1) and (5) of the Act. It refused to permit re-litigation of the appropriate unit question, rejected respondent's contention that the August election was invalid, and held that the November election was without effect "as it was a private election conducted in only one of two plants which the Board had previously found constituted a single appropriate unit and in which the union was certified." Finally it rejected respondent's contention that it had bargained in good faith.

The Board then issued an order in its usual form requiring the company to cease its unfair labor practices and to take certain affirmative action.

## II. Law

The essence of respondent's defenses and affirmative allegations of error is that the employees of the company have been deprived of their right to choose their collective bargaining representatives, and that the findings and conclusions of the Board are erroneous. This ignores the case of Brooks v. National Labor Relations Board, 1954, 348

---

3. Certainly the actions of the union during the negotiations with the company bear out the Board's contentions. The following notice to employees (quoted only in part) was issued by the union prior to the second "election":
"This Vote to Prove Union Majority Has Nothing To Do With the Government Vote Where the Union Won Election. This Vote Is Not a New Election.
"The results of this vote will have nothing to do with the election that was conducted by the Government and which was won by the Union. This vote is only being taken in the hope that the results will make any further action by the Government unnecessary. This vote cannot change the results of the Government election. The Union will still be certified by the Government in both plants regardless of the outcome of this vote. This Vote Is Only for the Purpose of Proving the Union Majority in the Avalon Plant So That Instead of Going Through Months of Government 'Red Tape', Contract Negotiations Can Start Immediately in Both Plants.
"If Union Wins Vote:
"1. Bargaining starts immediately in both plants.

"2. All Government 'red tape' for enforcement will no longer be necessary.
"3. From 3 to 18 months of time will be saved.
"If Union Loses Vote in Avalon Plant:
"1. The Union agrees to wait until the Government enforces the order for the Company to bargain on a contract.
"2. The Union still remains certified as the Union in both plants of The Deutsch Company. Nothing will be lost.
"3. The Deutsch Company will start bargaining for a Union contract in the Regent Street Plant.
"4. The company will not bargain in the Avalon Plant until the Government enforces the order to bargain.
"The Answer Is Simple. We have the Majority in the Avalon Plant. Let's Prove It in the Vote on Friday. This Will Mean We Are Finally Off to the Contract! The Deutsch Company Has Agreed to This.
"Only the people on the payroll of the Company as of July 9, 1956 will take part in this vote. This Can Be the End of Strikes and Work Stoppages.
"United Industrial Workers Local 976 AIW–AFL–CIO"

U.S. 96, at page 103, 75 S.Ct. 176, at page 181, 99 L.Ed. 125, where Mr. Justice Frankfurter says:

"Petitioner contends that whenever an employer is presented with evidence that his employees have deserted their certified union, he *may* henceforth refuse to bargain. In effect, he seeks to vindicate the rights of his employees to select their bargaining representative. If the employees are dissatisfied with their chosen union, they may submit their own grievance to the Board. If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, *while continuing to bargain in good faith* at least until the Board has given some indication that his claim has merit. Although the Board may, if the facts warrant, revoke a certification or agree not to pursue a charge of an unfair labor practice, these are matters for the Board; they do not justify employer self-help or judicial intervention. The underlying purpose of this statute is industrial peace. *To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it.*"

[Emphasis added.] Furthermore, on the question of the Board's findings, the clear language of the National Labor Relations Act, § 10(e), is controlling: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole *shall be conclusive.*" There is no doubt from reading the record that there is substantial evidence supporting the Board's findings.

The respondent specifies in its brief some seven alleged errors which it argues under five major headings. We now consider them in turn:

■■ (1) The question of the appropriateness of the *two-plant unit is one* which, as was already pointed out, even the Board found *could* have been decided either way. But as the NLRB says in its brief, this is a question within the broad discretion of the Board and will not be disturbed unless arbitrary or capricious. Pittsburgh Plate Glass Co. v. N. L. R. B., 1941, 313 U.S. 146, 164–165, 61 S.Ct. 908, 85 L.Ed. 1251; Foreman & Clark, Inc. v. N. L. R. B., 9 Cir., 1954, 215 F.2d 396, certiorari denied 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697. See also Packard Motor Car Co. v. N. L. R. B., 1947, 330 U.S. 485, 491–492, 67 S.Ct. 789, 91 L.Ed. 1040. Respondent offers against this legal position a discussion of the facts of *other* cases where the results differed. This does not demonstrate that the Board's actions are arbitrary or capricious, nor do we find they were.

■■ (2) The question of the irregularities in the election of August 8, 1956, is likewise one of ready solution. First, respondent failed to object to the election after it was held,[4] and not until the unfair labor practice charge came before the Board did it raise the issue. Second, the principal grounds under this point relied on by the company are that the election was irregular since not held on employer's premises and with less than all the eligible employees. Although the company had notice that the election was being held on that date, it refused to cooperate with the election at the Avalon plant (which undoubtedly resulted in a smaller number of employees participating) and forced the Board to hold the election off the premises of employer. An off-premises election was approved under similar circumstances in N. L. R. B. v. *National Mineral Co.,* 7 Cir. 1943, 134 F.2d 424, certiorari denied 320 U.S. 753, 64 S.Ct. 58, 88 L. Ed. 448.

Third, the question of the lack of a majority of those eligible to vote actual-

4. The Rules and Regulations of the Board require that objections be filed within certain periods after the election or they are, in effect, deemed waived. See 29 C.F.R. § 102.61, which was in effect at the time.

ly voting has been previously settled by several decisions.

■ It has repeatedly been held under well recognized rules attending elections that those not participating in the election must be presumed to assent to the expressed will of the majority of those voting, so that such majority determines the choice.

Here there were 460 employees eligible in the two-plant unit designated as appropriate. Two hundred and thirty voted, and of those voting 207 voted in favor of the union certified by the Board as the bargaining agent.

The Supreme Court in Virginian Ry. Co. v. System Federation No. 40, 1937, 300 U.S. 515, 559, 57 S.Ct. 592, 81 L. Ed. 789, in interpreting similar language used in the earlier Railway Labor Act (45 U.S.C. § 151, et seq.) gave the answer which Judge Parker of the Fourth Circuit described as "conclusive" with respect to the National Labor Relations Act, and, further, that any other conclusion was "absurd." [5] N. L. R. B. v.

5. "And we see no reason to think that a different rule was intended by the National Labor Relations Act. The pertinent language of that act is: 'Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining', 29 U.S.C.A. § 159. There would seem to be no material difference between the meaning of this provision and of that contained in the Railway Labor Act. That the provision quoted from the National Labor Relations Act was intended to apply to the selection of bargaining agents by employees the political principle of majority rule, is expressly stated in the Report of the House Committee accompanying the bill, where it is said: 'Section 9(a) incorporates the majority rule principle, that representatives designated for the purpose of collective bargaining by the majority of the employees in the appropriate unit shall be the exclusive representatives of all the employees' etc. Report No. 1147, of the House Committee on Labor to accompany S.1958, June 10, 1935, 74th Cong., 1st Sess., p. 19. The majority rule principle was that which had been adopted in the Railway Labor Act. Its application in ordinary political elections to situations where a majority of the votes cast was less than a majority of those qualified to vote had been settled in Carroll County v. Smith, supra [111 U.S. 556, 4 S.Ct. 539, 28 L.Ed. 517], and other decisions of the Supreme Court. The Virginian Railway decision gave it the same meaning when applied to industrial elections that it had when applied to ordinary political elections, and we see no reason to give it any different meaning here.

"Although there is no decision of the Supreme Court holding that a majority of the votes cast in an election is sufficient for the choice of a bargaining representative under the National Labor Relations Act, this is the holding of the Labor Board and of all of the Circuit Courts of Appeals which have had occasion to pass upon the question. See N.L.R.B. v. Central Dispensary & Emergency Hospital, 79 U.S.App.D.C. 274, 145 F.2d 852, certiorari denied [324 U.S. 847], 65 S.Ct. 684 [89 L.Ed. 1408]; New York Handkerchief Mfg. Co. v. N.L.R.B., 7 Cir., 114 F.2d 144, 148–149, certiorari denied 311 U.S. 704, 61 S.Ct. 170, 85 L. Ed. 457; N.L.R.B. v. National Mineral Co., 7 Cir., 134 F.2d 424, 426–428, certiorari denied 320 U.S. 753, 64 S.Ct. 58, 88 L.Ed. 448; N.L.R.B. v. Whittier Mills Co., 5 Cir., 111 F.2d 474, 477, 478; Marlin-Rockwell Corporation v. N.L.R.B., 2 Cir., 116 F.2d 586, 588, certiorari denied 313 U.S. 594, 61 S.Ct. 1116, 85 L.Ed. 1548; Matter of Western Foundry Co., 42 N.L.R.B. 302; Matter of Spring City Foundry, 11 N.L.R.B. 1286; Matter of R.C.A. Mfg. Co. Inc., 2 N.L.R.B. 159, 173. There are no contrary decisions.

"The company seeks to distinguish the Virginian Railway case and certain other of the decisions above cited on the ground that a majority of the employees participated in the elections there; but nothing in the statute furnishes the basis for such distinction. The statute requires that bargaining representatives be selected by the majority of the employees; and certainly a majority in favor of a representative cannot be scraped up by counting those who voted against him. The statute makes no provision for a quorum nor for the participation of any definite proportion of the employees in the election. It is, of course, the duty of the Board to see that the election is fairly advertised and held and that the results are fairly representative of the wishes of the employees; but where these conditions are met and no undue pres-

Standard Lime & Stone Co., 4 Cir., 1945, 149 F.2d 435, 436–439. And we observe that Judge Parker relied not only on his analogy between the two Acts, but on specific congressional language in the House Committee's Report on the National Labor Relations Act that "the bill is merely an amplification and further clarification of the principles enacted into law by the Railway Labor Act and by section 7(a) of the National Industrial Recovery Act, 48 Stat. 198 * * *.", (Report of Committee on Labor to accompany S. 1958, H.R.Rep. No. 1147, 74th Congress, 1st Sess. 2 (1935).) and points out that Congress knew and understood that the Railway Labor Act was so interpreted, by the Senate Committee's Report on the 1934 Amendment, wherein it was stated: "The bill specifically provides that the choice of representatives in any craft shall be determined by *a majority of the employees voting on the question.*"[6] [Emphasis supplied by Judge Parker.]

The rule of law enunciated in the Standard Lime & Stone Co. case, supra, was applied to an election where no hos-

tile nor unfair influence or intimidation existed on the part of the employer. There is even more reason to follow the rule in those cases where the employer has attempted to discourage or prevent the election of the bargaining agent.

In N. L. R. B. v. National Mineral Co., supra, the Seventh Circuit considered such a situation, after but 83 out of 453 employees voted. Seventy-one voted for the union, 11 against, and 1 ballot was not counted. There the court, speaking through Judge (later Justice) Minton, reemphasized its previous decision in New York Handkerchief Mfg. Co. v. N. L. R. B., 7 Cir., 1940, 114 F.2d 144, 149, and stated:

"The unfair labor practices and the hostile, noncooperative attitude of the company may very properly account for the failure of many employees to vote. The employees' lack of interest, always a factor in every election, kept others from the polls. If they chose, without fear or intimidation, to stay away, they cannot complain that others have in

sure is exerted, there is no reason why the ordinary political rule should not be applied, viz., that those who do not take the trouble to vote acquiesce in the choice registered by the majority of those voting.

 * * * * *

"There is every reason to apply the sensible political rule to elections of this sort, and no reason that we can see to the contrary. The elections are held, not for the purpose of choosing representatives for the employees in their private and personal capacities, but for the purposes of collective bargaining, i. e., for the purpose of setting up industrial democracy by choosing some one to represent the interest of the employees in determining the rate of wages, hours of work, living conditions, etc., for the plant. The establishment of such industrial democracy is the avowed purpose of the National Labor Relations Act, which declares it to be in the public interest because of its tendency to preserve industrial peace and prevent interference with interstate commerce. 29 U.S.C.A. § 151. This being true, it would be as ab-

surd to hold that collective bargaining is defeated because a majority of employees fail to participate in an election of representatives as it would be to hold that the people of a municipality are without officers to represent them because a majority of the qualified voters do not participate in an election held to choose such officers. In the one case, as in the other, the representative is being chosen to represent a constituency because it is in the public interest that the constituency be represented; and all that should be necessary is that the election be properly advertised and fairly held and that the settled principle of majority rule be applied to the result. If the employees do not wish to be represented in collective bargaining they can so declare in the election; but where, as here, only a comparatively small number so express themselves the result should not be the same as if a majority had so voted. We pointed out in the Virginian Railway case the disadvantages and dangers which would follow from failure to apply the political rule in such elections." 149 F. 2d at pages 437–439.

6. 149 F.2d at page 437, n. 2.

effect exercised their franchise." 134 F.2d at page 428.

In the New York Handkerchief case, supra, 56 out of 225 employees had voted. Certain acts by the employers caused the minority vote.

In N. L. R. B. v. Central Dispensary & Emergency Hospital, 1944, 79 U.S. App.D.C. 274, 145 F.2d 852, 854, Judge Arnold considered the problem, and particularly whether the rule that a majority of the minority controls only when there has been some hostile or restrictive act on the part of an employer. In rejecting any such test, the opinion comes to the conclusion that the cautionary language in the New York Handkerchief case [7] does not establish "any rigid rule requiring the vote of a majority of all employees, in the absence of employer coercion. * * * The real test is whether the election is actually representative. This is always a question of fact in the particular case." Like any other authority, it must not be employed arbitrarily.

The Central Dispensary case then concludes:

"It is * * * argued that the language of the Act referring to representatives selected for the purposes of collective bargaining 'by the majority of the employees in a unit appropriate for such purposes' [29 U.S.C. §§ 151, 159(a)] excludes an election by a minority.

"This question seems to us to be settled by the Virginian Railway case [citing and quoting it]. This case has been followed uniformly by both the Courts and the National Labor Relations Board."

Here there is cited the Handkerchief case, supra (7 Cir.), the National Mineral case, supra (7 Cir.), Marlin-Rockwell Corp. v. N. L. R. B., 2 Cir., 1941,

116 F.2d 586; N. L. R. B. v. Whittier Mills, 5 Cir., 1940, 111 F.2d 474, 477; Matter of Western Foundry Co., 42 N. L. R. B. 302; Matter of Spring City Foundry, 11 N. L. R. B. 1286; Matter of R. C. A. Mfg. Co., Inc., 2 N.L.R.B. 159.

It should be noted that certiorari has been denied by the United States Supreme Court in the Handkerchief case,[8] the National Mineral case,[9] the Central Dispensary case,[10] and in the Standard Lime & Stone case.[11]

Finding no adjudicated cases to the contrary, we can only conclude that these illustrate the prevailing view.[12]

(3) We next consider the validity of the second "election" upon which respondent places considerable emphasis. The brief of the company insists that the union agreed that the election would be held to determine if the employees at Avalon wanted this union to represent them and that if the union lost it would not make any further attempts to bargain for that particular plant. The agreement did say this, but it also added "until the question of representation is tested and determined by the circuit court of appeals." The union never put itself in the position the company claims it did, but always made clear that it would temporarily take a position so that it could get something done in the way of a contract, which the employer would not otherwise consider. As the NLRB points out, the situation is similar to McQuay-Norris Mfg. Co. v. N. L. R. B., 7 Cir., 1940, 116 F.2d 748, 751–752, certiorari denied, 1941, 313 U.S. 565, 61 S.Ct. 843, 85 L.Ed. 1524, where a union made an agreement with the employer so that some sort of contract negotiations could commence. The union as well as the employer was bound to accept the Board's determination of the bargaining unit and could not lawfully

7. "It does not follow, however, that the Board could justify itself in the exercise of such authority in every case regardless of the number who participated in the election." 114 F.2d 144, at page 149.

8. 311 U.S. 704, 61 S.Ct. 170, 85 L.Ed. 457;

9. 320 U.S. 753, 64 S.Ct. 58, 88 L.Ed. 448;

10. 324 U.S. 847, 65 S.Ct. 684, 89 L.Ed. 1408;

11. 326 U.S. 723, 66 S.Ct. 28, 90 L.Ed. 429.

12. See, 18 Am.Jur., Elections, § 243 (1938).

bargain for less than the whole group of employees in the bargaining unit determined by the NLRB, even if it wanted to do so. Steele v. Louisville & Nashville R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Cf. National Licorice Co. v. N. L. R. B., 1940, 309 U.S. 350, 362, 364, 60 S.Ct. 569, 84 L.Ed. 799, to the effect that rights under the labor laws are public as opposed to private rights of the parties. Secondly, the union did not agree to give up entirely if it lost the election. As was previously pointed out, all the union did was to agree to this election so that bargaining could commence as to at least one plant. Thirdly, this election cannot in any way bind the NLRB since it was extra-legal. Agreements between the parties are not binding on the NLRB. N. L. R. B. v. American Potash & Chemical Corp., 9 Cir., 1940, 113 F.2d 232, 234–235, 129 A.L.R. 874.

(4) Respondent's contentions on the last major point amount to a claim that the union, by entering this agreement for a private election, has now waived any rights it may have had under the NLRB order. This is, of course, unnecessary to reach since it is obvious that the agreement was not a waiver of the union's rights. We have discussed this in point (3) above.

 Finally, there is the point underlying all of respondent's claims, that the company did bargain in good faith. This is manifestly a question of fact, and could be found untrue from the record and admissions of the company's own representatives.[13]

 The crux of this dispute is in what the company was willing to bargain about. It was only willing to discuss the problem of representation, and the appropriate unit question. It is well settled that these questions are *not* for the parties to discuss and are outside the realm of collective bargaining. See Douds v. International Longshore-

men's Ass'n, 2 Cir., 1957, 241 F.2d 278, 282. Compare also the holding in N. L. R. B. v. Retail Clerk's Int'l Ass'n, 9 Cir., 1953, 203 F.2d 165, 169–170, to the effect that unions may not condition their duty to bargain collectively for the bargaining unit which they represent upon the employer's bargaining with a class of employees *outside* the unit. From the record it appears plain that the company *did* refuse to bargain collectively as charged, and this is an unfair labor practice.

We find no other points necessary to discuss here. The petition for enforcement of the NLRB order is granted. The petition to modify and set aside orders of the NLRB is denied.

13. See, e. g., statements of the manager, Philip Holzman, R. 356, 359, 360; and the letter of Aiken of Rea Associates to the regional office of the NLRB, R. 353, 354.