# NATIONAL LABOR RELATIONS BOARD *v.* HENDRICKS COUNTY RURAL ELECTRIC MEMBERSHIP CORP.

No. 80–885.  Argued October 5, 1981—Decided December 2, 1981*

---

*Together with *National Labor Relations Board* v. *Malleable Iron Range Co.* (see this Court's Rule 19.4), and No. 80–1103, *Hendricks County Rural Electric Membership Corp.* v. *National Labor Relations Board,* also on certiorari to the same court.

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined. POWELL, J. filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined, *post*, p. 192.

*Deputy Solicitor General Wallace* argued the cause for petitioner in No. 80–885 and respondent in No. 80–1103. With him on the briefs were *Solicitor General Lee*, former *Solicitor General McCree, Barry Sullivan, Norton J. Come*, and *Linda Sher*.

*Warren D. Krebs* argued the cause and filed a brief for Hendricks Rural Electric Membership Corp., respondent in No. 80–885 and petitioner in No. 80–1103. *Russ R. Mueller* argued the cause and filed a brief for Malleable Iron Range Co., respondent in No. 80–885.†

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented is whether an employee who, in the course of his employment, may have access to information considered confidential by his employer is impliedly ex-

---

†Briefs of *amici curiae* urging reversal in both No. 80–885 and No. 80–1103 were filed by *J. Albert Woll, Laurence Gold*, and *George Kaufmann* for the American Federation of Labor and Congress of Industrial Organizations; and by *John A. Fillion* for United Auto Workers. *Joseph E. Finley* filed a brief for the Office and Professional Employees International Union, AFL–CIO, CLC, urging reversal in No. 80–885.

*David Crump* filed a brief for the Legal Foundation of America as *amicus curiae* urging affirmance in both No. 80–885 and No. 80–1103.

*Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* in both No. 80–885 and No. 80–1103.

cluded from the definition of "employee" in § 2(3) of the National Labor Relations Act and denied all protections under the Act.[1]

I

We have before us two cases under the same docket number. We shall first state separately the factual and procedural background of each.

## The Hendricks case

Mary Weatherman was the personal secretary to the general manager and chief executive officer of respondent Hendricks County Rural Electric Membership Corp. (Hendricks), a rural electric membership cooperative. She had been employed by the cooperative for nine years. In May 1977 she signed a petition seeking reinstatement of a close friend and fellow employee, who had lost his arm in the course of employment with Hendricks, and had been dismissed. Several days later she was discharged.

Weatherman filed an unfair labor practice charge with the National Labor Relations Board (NLRB or Board), alleging that the discharge violated § 8(a)(1) of the National Labor Relations Act (NLRA or Act), 29 U. S. C. § 158(a)(1). Hendricks' defense, *inter alia*, was that Weatherman was denied

---

[1] Section 2(3), 61 Stat. 137, as set forth in 29 U. S. C. § 152(3), provides:
"The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined."

the Act's protection because as a "confidential" secretary she was impliedly excluded from the Act's definition of "employee" in § 2(3). The Administrative Law Judge (ALJ) rejected this argument. He noted that the Board's decisions had excluded from bargaining units only those "confidential employees . . . [']who assist and act in a confidential capacity to persons who formulate, determine, and effectuate management policies in the field of labor relations.'" 236 N. L. R. B. 1616, 1619 (1978), quoting *B. F. Goodrich Co.*, 115 N. L. R. B. 722, 724 (1956). Applying this "labor nexus" test, the ALJ found that Weatherman was not in any event such a "confidential employee."[2] He also determined that Hendricks had discharged Weatherman for activity—signing the petition—protected by § 7 of the Act, 29 U. S. C. § 157.[3] The ALJ thus sustained Weatherman's unfair labor practice charge. The Board affirmed "the rulings, findings, and conclusions of the Administrative Law Judge," and ordered that Weatherman be reinstated with backpay. 236 N. L. R. B., at 1616.

Hendricks sought review in the United States Court of Appeals for the Seventh Circuit and the Board cross-petitioned for enforcement. A divided panel of the court reversed and remanded for further proceedings. 603 F. 2d 25 (1979). Although the majority agreed with the Board's factual finding that Weatherman did not "assist in a confidential capacity with respect to labor relations policies," *id.*, at 28, the majority, relying on language in a footnote to *NLRB* v. *Bell Aero-*

---

[2] The ALJ held that although the Board excluded confidential employees with a labor nexus from bargaining units, it afforded them the other protections of the NLRA. Therefore, the ALJ held, even if Weatherman were a confidential employee excludable from a bargaining unit, § 8(a)(1) barred Hendricks from discharging Weatherman for engaging in protected concerted activity.

[3] The Board has held that circulation of a petition on behalf of a discharged employee is protected activity under § 7. *Youngstown Osteopathic Hospital Assn.*, 224 N. L. R. B. 574 (1976).

*space Co.*, 416 U. S. 267, 284, n. 12 (1974), held that "*all* secretaries working in a confidential capacity, without regard to labor relations, [must] be excluded from the Act." 603 F. 2d, at 30.[4] The Court of Appeals therefore remanded for a determination whether Weatherman came within this substantially broader definition of confidential secretary.

On remand, the Board found that Weatherman was not privy to the confidences of her employer and thus concluded that she did not fall within the broader definition of confidential secretary that the Court of Appeals had directed the Board to apply. 247 N. L. R. B. 498 (1980).[5] Hendricks again petitioned for review and the Board cross-petitioned for enforcement. The Court of Appeals, by a divided panel, denied enforcement. 627 F. 2d 766 (1980). The majority held that the Board had "actually reapplie[d] the old standard incorporating the labor nexus," and that the evidence in the

---

[4] Judge Bonsal, sitting by designation, dissented, being of the view that the record established that Weatherman was not a confidential employee.

[5] The Board stated in part:

"Although Weatherman typed all of [general manager] Dillon's letters, this correspondence apparently did not relate to labor relations or personnel matters other than occasional letters referring to the dates of negotiating meetings with a union. Nor is there any evidence that it concerned confidential matters of any description. Weatherman generally did not place Dillon's telephone calls, nor did she keep a record of his appointments. Weatherman did share a partitioned office with Dillon, but no personnel records or confidential records of any type were kept there, excluding Dillon's testimony that he kept some papers concerning labor negotiations in a file behind his desk. Weatherman did not attend meetings of Respondent's board of directors or other management meetings. However, she did type minutes of meetings of the board of directors and the agenda for such meetings. While these meetings apparently occasionally involved personnel matters, there is no indication that such matters, or any other issues discussed during them, were confidential. Weatherman did not type internal memoranda regarding labor relations or personnel or employment matters. Finally, and most significantly, Dillon conceded at the hearing that the Respondent did not maintain secret or classified papers or documents." 247 N. L. R. B., at 498–499 (footnotes omitted).

record failed to support a finding that Weatherman did not come within the court's broader definition of confidential secretary. *Id.*, at 770.[6]

### The Malleable case

This case grew out of efforts of the Office and Professional Employees International Union (Union) to represent, as collective-bargaining agent, various employees of respondent Malleable Iron Range Co. (Malleable). In December 1978 the Union sought certification as the collective-bargaining representative for a unit of office clerical, technical, and professional personnel employed at the respondent's facility in Beaver Dam, Wis. At the subsequent representation hearing, Malleable challenged the inclusion of 18 employees in the unit on the ground that they had access to confidential business information. The Regional Director of the NLRB rejected Malleable's objection, concluding that none of the challenged 18 employees was a confidential employee under the Board's "labor nexus" test. App. to Pet. for Cert. 76a–94a. The Union prevailed in a later representation election, and was accordingly certified as the bargaining agent for the unit. Malleable nevertheless refused to bargain with the Union. Seeking relief, the Union filed unfair labor practice charges with the NLRB. The Board found that Malleable's refusal to bargain violated §§ 8(a)(5) and (1) of the Act, 29 U. S. C. §§ 158(a)(5) and (1), and issued a bargaining order. 244 N. L. R. B. 485 (1979).

Malleable petitioned the Court of Appeals for the Seventh Circuit for review of the order and the Board cross-petitioned for enforcement. In an unreported opinion, a divided panel of the court denied enforcement. App. to Pet. for Cert.

---

[6] Judge Cudahy dissented. He suggested, *inter alia*, that there "is abundant evidence in the record to support the Board's conclusion that Weatherman is not properly classified as a confidential secretary." 627 F. 2d, at 771.

56a–60a.   Order denying enforcement, 631 F. 2d 734 (1980). The majority noted that the Regional Director, in determining that none of the 18 individuals was a confidential employee, had applied the Board's labor-nexus test which the Seventh Circuit had rejected in the earlier decisions involving Hendricks.   The court remanded the case to the Board for reconsideration consistent "with the *Hendricks* case." App. to Pet. for Cert. 56a, 59a.

We granted the Board's petition for certiorari in both cases to resolve the conflict among the Courts of Appeals respecting the propriety of the Board's practice of excluding from collective-bargaining units only those confidential employees with a "labor nexus," while rejecting any claim that all employees with access to confidential information are beyond the reach of § 2(3)'s definition of "employee."[7]   450 U. S. 964 (1981).   We hold that there is a reasonable basis in law for the Board's use of the "labor nexus" test.   We therefore reverse the judgments of the Court of Appeals, with directions in the *Hendricks* case to enforce the Board's order,[8] and with

---

[7] Cf. *Union Oil of California, Inc.* v. *NLRB*, 607 F. 2d 852, 853–854 (CA9 1979); *NLRB* v. *Allied Products Corp.*, 548 F. 2d 644, 648 (CA6 1977); *Westinghouse Electric Corp.* v. *NLRB*, 398 F. 2d 669, 670 (CA6 1968); *NLRB* v. *Quaker City Life Ins. Co.*, 319 F. 2d 690, 694 (CA4 1963); *NLRB* v. *Armour & Co.*, 154 F. 2d 570, 573–574 (CA10 1945); *NLRB* v. *Poultrymen's Service Corp.*, 138 F. 2d 204, 210–211 (CA3 1943).

[8] We also granted Hendricks' cross-petition in No. 80–1103, which presented the question whether the Court of Appeals properly rejected Hendricks' claim that Weatherman was the functional equivalent of a personnel department employee and therefore excluded from coverage of the Act on that basis as well.   After briefing and argument, however, we are persuaded that our grant of certiorari on the cross-petition was improvident. The Court of Appeals held that the evidence in the record supported the Board's finding that Weatherman was not the functional equivalent of a personnel department employee.   As such, we are presented primarily with a question of fact, which does not merit Court review.   The writ of certiorari in No. 80–1103 is therefore dismissed as improvidently granted. See *Rudolph* v. *United States*, 370 U. S. 269 (1962) *(per curiam); Southern Power Co.* v. *North Carolina Public Service Co.*, 263 U. S. 508 (1924).

directions in the *Malleable* case for further proceedings consistent with this opinion.

## II

Section 2(3) of the NLRA provides that the "term 'employee' shall include *any* employee . . ." (emphasis added), with certain stated exceptions such as "agricultural laborers," "supervisors" as defined in § 2(11), and "independent contractors." [9]  Under a literal reading of the phrase "any employee," then, the workers in question are "employees." But for over 40 years, the NLRB, while rejecting any claim that the definition of "employee" in § 2(3) excludes confidential employees, has excluded from the collective-bargaining units determined under the Act those confidential employees satisfying the Board's labor-nexus test.  Respondents Hendricks and Malleable (hereafter respondents) argue that contrary to the Board's practice, all employees who may have access to confidential business information are impliedly excluded from the definition of employee in § 2(3).

In assessing the respondents' argument, we must be mindful of the canon that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially where Congress has refused to alter the administrative construction." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 381 (1969) (footnote omitted); see *NLRB* v. *Bell Aerospace Co.*, 416 U. S., at 274–275; *Zemel* v. *Rusk*, 381 U. S. 1, 11–12 (1965).  We therefore proceed to review the Board's determinations from 1940 to 1946 whether confidential employees were "employees" within § 2(3) of the NLRA (Wagner Act), and then determine whether Congress, when it considered those determinations in enacting the Labor Management Relations Act of 1947 (Taft-Hartley Act), intended to alter the Board's practice.

---

[9] For the full text of the current definition, see n. 1, *supra*.

## A

In 1935 the Wagner Act became law. 49 Stat. 449. The Act's broad objectives were to "encourag[e] the practice and procedure of collective bargaining and . . . protec[t] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." *Id.*, at 449–450. The employees covered by the Act were defined in § 2(3): "The term 'employee' shall include any employee . . . but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse." Although the Act's express exclusions did not embrace confidential employees, the Board was soon faced with the argument that all individuals who had access to confidential information of their employers should be excluded, as a policy matter, from the definition of "employee." The Board rejected such an implied exclusion, finding it to have "no warrant under the Act." *Bull Dog Electric Products Co.*, 22 N. L. R. B. 1043, 1046 (1940). See also *Creamery Package Manufacturing Co.*, 34 N. L. R. B. 108, 111 (1941). But in fulfilling its statutory obligation to determine appropriate bargaining units under § 9 of the Act, 29 U. S. C. § 159, for which broad discretion has been vested in the Board, see *Packard Motor Car Co.* v. *NLRB*, 330 U. S. 485, 491–492 (1947); *Pittsburgh Plate Glass Co.* v. *NLRB*, 313 U. S. 146 (1941), the Board adopted special treatment for the narrow group of employees with access to confidential, labor-relations information of the employer. The Board excluded these individuals from bargaining units composed of rank-and-file workers.[10] See, *e. g., Brooklyn Daily Eagle*, 13

---

[10] Although the early decisions did not explicitly preclude the Board from certifying a bargaining unit composed solely of confidential employees, that possibility was apparently foreclosed in *Hoover Co.*, 55 N. L. R. B. 1321,

N. L. R. B. 974, 986 (1939); *Creamery Package Manufacturing Co.*, *supra*, at 110.    The Board's rationale was that "management should not be required to handle labor relations matters through employees who are represented by the union with which the [c]ompany is required to deal and who in the normal performance of their duties may obtain advance information of the [c]ompany's position with regard to contract negotiations, the disposition of grievances, and other labor relations matters."    *Hoover Co.*, 55 N. L. R. B. 1321, 1323 (1944).

Following its formulation, through 1946, the Board routinely applied the labor-nexus test in numerous decisions to identify those individuals who were to be excluded from bargaining units because of their access to confidential information.[11]    And in at least one instance in which a Court of Ap-

---

1322–1323 (1944), and *Electric Boat Co.*, 57 N. L. R. B. 1348, 1349 (1944), thereby excluding confidential employees, as defined by the Board, from collective-bargaining units.

[11] See *Warner Brothers Pictures, Inc.*, 35 N. L. R. B. 739, 744 (1941); *Chrysler Corp.*, 36 N. L. R. B. 157, 161–162 (1941); *Western Union Telegraph Co.*, 36 N. L. R. B. 1066, 1069 (1941); *General Motors Corp.*, 37 N. L. R. B. 441, 446–447 (1941); *Montgomery Ward & Co.*, 38 N. L. R. B. 297, 300 (1942); *Chrysler Detroit Co.*, 38 N. L. R. B. 313, 321 (1942); *Cincinnati Times-Star Co.*, 39 N. L. R. B. 39, 42 (1942); *Poultrymen's Service Corp.*, 41 N. L. R. B. 444, 448 (1942), enf'd, 138 F. 2d 204 (CA3 1943); *Polish National Alliance*, 42 N. L. R. B. 1375, 1381–1382 (1942), enf'd as modified, 136 F. 2d 175 (CA7 1943), aff'd, 322 U. S. 643 (1944); *Bendix Products Division*, 43 N. L. R. B. 912, 915–916 (1942); *Paramount Pictures, Inc.*, 45 N. L. R. B. 116, 122–123 (1942); *Murray Corp.*, 45 N. L. R. B. 854, 856–857 (1942); *Puget Sound Bridge & Dredging Co.*, 46 N. L. R. B. 1071, 1074 (1943); *Bohn Aluminum & Brass Corp.*, 47 N. L. R. B. 1229, 1231 (1943); *Armour & Co.*, 49 N. L. R. B. 688, 690 (1943); *Firestone Tire & Rubber Co.*, 50 N. L. R. B. 679, 682 (1943); *Boston Edison Co.*, 51 N. L. R. B. 118, 123 (1943); *Republic Steel Corp.*, 51 N. L. R. B. 1228, 1230 (1943); *St. Johns River Shipbuilding Co.*, 52 N. L. R. B. 12, 17 (1943); *General Motors Corp.*, 52 N. L. R. B. 649, 653–655 (1943); *Babcock & Wilcox Co.*, 52 N. L. R. B. 900, 903 (1943); *U. S. Smelting, Refining & Mining Co.*, 53 N. L. R. B. 84, 86 (1943); *New York*

peals had occasion to review the Board's application of a labor-nexus test under the Wagner Act, the test was upheld. *NLRB* v. *Poultrymen's Service Corp.*, 138 F. 2d 204, 210–211 (CA3 1943). See also *NLRB* v. *Armour & Co.*, 154 F. 2d 570, 573–574 (CA10 1945); *Polish National Alliance* v. *NLRB*, 136 F. 2d 175, 180 (CA7 1943), aff'd, 322 U. S. 643 (1944).

In 1946, in *Ford Motor Co.*, 66 N. L. R. B. 1317, 1322, the Board refined slightly the labor-nexus test because in its view the "definition [was] too inclusive and needlessly preclude[d] many employees from bargaining collectively together with other workers having common interests." Henceforth, the Board announced, it intended "to limit the term 'confidential' so as to embrace only those employees who assist and act in a confidential capacity to persons who

---

*Telephone Co.*, 53 N. L. R. B. 307, 310 (1943); *Potash Co.*, 53 N. L. R. B. 441, 444 (1943); *Coolerator Co.*, 53 N. L. R. B. 461, 462–464 (1943); *Colonial Broach Co.*, 53 N. L. R. B. 846, 848 (1943); *General Motors Corp.*, 53 N. L. R. B. 1096, 1100 (1943); *Consolidated Vultee Aircraft Corp.*, 54 N. L. R. B. 103, 112–114 (1943); *Armour & Co.*, 54 N. L. R. B. 1005, 1013 (1944), enf'd as modified, 154 F. 2d 570 (CA10 1945); *Armour & Co.*, 54 N. L. R. B. 1462, 1465 (1944); *General Cable Corp.*, 55 N. L. R. B. 1143, 1145–1146 (1944); *Hoover Co.*, 55 N. L. R. B. 1321, 1322–1323 (1944); *West Penn Power Co.*, 55 N. L. R. B. 1356, 1358 (1944); *Spicer Manufacturing Corp.*, 55 N. L. R. B. 1491, 1503 (1944); *Bell Aircraft Corp.*, 56 N. L. R. B. 1356, 1359 (1944); *General Motors Corp.*, 56 N. L. R. B. 1547, 1549–1550 (1944); *Utah Copper Co.*, 57 N. L. R. B. 308, 315–318 (1944); *Electric Boat Co.*, 57 N. L. R. B. 1348, 1349 (1944); *Chrysler Corp.*, 58 N. L. R. B. 239, 243–246 (1944); *American Steel & Wire Co.*, 58 N. L. R. B. 253, 255 (1944); *U. S. Automatic Corp.*, 58 N. L. R. B. 662, 664 (1944); *South Bend Lathe Works*, 59 N. L. R. B. 562, 564 (1944); *Houdaille-Hershey Corp.*, 59 N. L. R. B. 1292, 1295 (1944); *Aluminum Co. of America*, 60 N. L. R. B. 388, 391 (1945); *Consolidated Vultee Aircraft Corp.*, 60 N. L. R. B. 525, 527 (1945); *Continental Steel Corp.*, 61 N. L. R. B. 97, 99–102 (1945); *American Smelting and Refining Co.*, 61 N. L. R. B. 506, 508–509 (1945); *Pacific Gas & Electric Co.*, 61 N. L. R. B. 564, 568 (1945); *Magnolia Pipe Line Co.*, 61 N. L. R. B. 723, 726–728 (1945); *Bethlehem Steel Co.*, 63 N. L. R. B. 1230, 1234–1236 (1945).

exercise 'managerial' functions in the field of labor relations."[12]   This was the state of the law in 1947 when Congress amended the NLRA through the enactment of the Taft-Hartley Act.   61 Stat. 136.

## B

Although the text of the Taft-Hartley Act also makes no explicit reference to confidential employees, when Congress addressed the scope of the NLRA's coverage, the status of confidential employees was discussed.   But nothing in that legislative discussion supports any inference, let alone conclusion, that Congress intended to alter the Board's pre-1947 determinations that only confidential employees with a "labor nexus" should be excluded from bargaining units.   Indeed, the contrary appears.

The Taft-Hartley Act was in part a response to the Court's decision in *Packard Motor Car Co.* v. *NLRB*, 330 U. S. 485 (1947), which upheld the Board's certification of a bargaining unit composed of plant foremen.   See *NLRB* v. *Bell Aerospace Co.*, 416 U. S., at 279.   Although the House and Senate initially passed differing bills, both Houses explicitly excluded "supervisors" from the definition of "employee" in the NLRA.   H. R. 3020, 80th Cong., 1st Sess., § 2(3) (1947); S. 1126, 80th Cong., 1st Sess., § 2(3) (1947).   In defining the term "supervisor," however, the bills differed substantially. The House bill defined "supervisor" to include within its scope the confidential employee, broadly defined as one "who by the nature of his duties is given by the employer information that is of a confidential nature, and that is not available to the public, to competitors, or to employees generally, for

---

[12] The *Ford Motor* approach was followed in three decisions in 1946.   *St. Louis Independent Packing Co.*, 67 N. L. R. B. 543, 547; *Tennessee Gas & Transmission Co.*, 67 N. L. R. B. 1375, 1379; *Brown & Sharpe Manufacturing Co.*, 68 N. L. R. B. 487, 489.

use in the interest of the employer."[13] The Senate, on the other hand, did not include the confidential employee within its definition of "supervisor."[14]

The differing House and Senate bills were submitted to a Conference Committee. In Committee, the Senate definition of "supervisor," with no reference to confidential em-

---

[13] Section 2(12) of the House bill read in its entirety:

"The term 'supervisor' means any individual—

"(A) who has authority, in the interest of the employer—

"(i) to hire, transfer, suspend, lay off, recall, promote, demote, discharge, assign, reward, or discipline any individuals employed by the employer, or to adjust their grievances, or to effectively recommend any such action; or

"(ii) to determine, or make effective recommendations with respect to, the amount of wages earned by any individuals employed by the employer, or to apply, or to make effective recommendations with respect to the application of, the factors upon the basis of which the wages of any individuals employed by the employer are determined, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the exercise of independent judgment;

"(B) who is employed in labor relations, personnel, employment, police, or time-study matters or in connection with claims matters of employees against employers, or who is employed to act in other respects for the employer in dealing with other individuals employed by the employer, or who is employed to secure and furnish to the employer information to be used by the employer in connection with any of the foregoing; or

"(C) who by the nature of his duties is given by the employer information that is of a confidential nature, and that is not available to the public, to competitors, or to employees generally, for use in the interest of the employer."

[14] The Senate bill defined "supervisor" in § 2(11) in the following terms:

"The term 'supervisor' means any individual having authority, in the interest of the employer to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or to adjust their grievances, or effectively to recommend such action if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

The Senate Committee that reported the bill out apparently considered

ployees, prevailed. As described in the statement of the House Managers, appended to the Conference Report:

> "The conference agreement, in the definition of 'supervisor,' limits such term to those individuals treated as supervisors under the Senate amendment. In the case of persons working in the labor relations, personnel and employment departments, it was not thought necessary to make specific provision, as was done in the House bill, since the Board has treated, and presumably will continue to treat, such persons as outside the scope of the act. This is the prevailing Board practice with respect to such people as confidential secretaries as well, and it was not the intention of the conferees to alter this practice in any respect." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 35 (1947).[15]

With this understanding, both Houses adopted the Conference Report, 93 Cong. Rec. 6393 (1947) (House); *id.*, at 6536

---

but rejected a more expansive definition. See S. ——, 80th Cong., 1st Sess., § 2(12) (1947) (Act amending NLRA; Comm. Print, Mar. 19, 1947); S. ——, 80th Cong., 1st Sess., § 2(12) (1947) (Act amending NLRA; Comm. Print, Mar. 21, 1947).

[15] Senator Taft similarly described the Conference Committee's action in a written summary inserted in the Congressional Record:

"Supervisors: Both the House bill and the Senate amendment excluded supervisors from the individuals deemed to be employees for the purposes of the act. There was a sharp divergence between the House and Senate, however, with respect to the occupational groups which fell within this definition. The Senate amendment, which the conference ultimately adopted, is limited to bona fide supervisors. The House had included numerous other classes. There were generally (A) certain personnel who fix the amount of wages earned by other employees, such as inspectors, checkers, weighmasters, and time-study personnel, (B) labor relations personnel, police, and claims personnel, and (C) *confidential employees*. The Senate amendment confined the definition of supervisor to individuals generally regarded as foremen and employees of like or higher rank." 93 Cong. Rec. 6442 (1947) (emphasis added).

(Senate). Although President Truman vetoed the Taft-Hartley bill, see *id.*, at 7485–7488 (veto message), the bill nevertheless became law when Congress successfully overrode the veto, *id.*, at 7489 (House); *id.*, at 7538 (Senate).

The Court of Appeals interpreted the legislative history of Congress' exclusion of "supervisors" from the definition of "employees" as warranting an implied exclusion for all workers who may have access to confidential business information of their employer. That interpretation must be rejected. It is flatly belied by the Conference Committee's rejection of the House proposal of an exclusion of all confidential employees—for obviously the House conceded on this issue to the Senate.[16]

Indeed, the Taft-Hartley Act's express inclusion of "professional employees" under the Act's coverage[17] negates any reading of the legislative history as excluding confidential employees generally from the definition of employee in § 2(3). The definition of professional employees was intended to cover "such persons as legal, engineering, scientific and med-

---

[16] This concession is clear in the comments made by Representative Hartley, sponsor of the House bill, in explaining to the full House the results of the House-Senate Conference:

"Entirely too much emphasis has been placed on the so-called concessions that the House conferees made during the conference. I will be very frank and say that I agreed to some of these concessions very reluctantly. I would much rather have seen the House bill as it originally passed enacted into law, but I want to see a bill that can be enacted into law passed by this Congress. . . .

"I also want to make it perfectly clear that there was no concession made except upon the assurance that it would provide us votes in another body to be certain that the legislation would be enacted into law." *Id.*, at 6383–6384.

[17] See § 9(b) of the NLRA, 29 U. S. C. § 159(b) (providing that the Board may not approve a bargaining unit "if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit"); § 2(12), 29 U. S. C. § 152(12) (defining "professional employee").

ical personnel together with their junior professional assistants." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 36 (1947).[18] But surely almost all such persons would likely be privy to confidential business information and thus would fall within the broad definition of confidential employee excluded under the House bill. It would therefore be extraordinary to read an implied exclusion for confidential employees into the statute that would swallow up and displace almost the entirety of the professional-employee inclusion.

Plainly, too, nothing in the legislative history of the Taft-Hartley Act provides any support for the argument that Congress disapproved the Board's prior practice of applying a labor-nexus test to identify confidential employees whom the Board excluded from bargaining units. To the contrary, the House Managers' statement accompanying the Conference Committee Report indicates that Congress intended to leave the Board's historic practice undisturbed.[19]

---

[18] The House bill did not define "professional employees," but did explicitly give "any craft, department, plant, trade, calling, *profession* or other distinguishable group within a proposed bargaining unit" the opportunity to exclude itself from the bargaining unit. H. R. 3020, 80th Cong., 1st Sess., § 9(f)(2) (1947) (emphasis added). The Senate bill similarly allowed groups of professional employees to exclude themselves from bargaining units, § 9(b)(1), but in addition defined the term "professional employee." The version that ultimately was adopted by both Houses incorporated the Senate's definition of professional employee and permitted groups of professional employees to exclude themselves from proposed bargaining units in which nonprofessional employees were to be included. See n. 17, *supra*.

[19] It is true that the Conference Committee Report, in stating that the Board had treated confidential employees as "outside the scope of" the Wagner Act, could suggest that Congress failed to discern the Board's actual practice of excluding confidential employees, as defined by the labor-nexus test, from bargaining units, but still affording them the other protections of the Act. See, *e. g.*, *Bethlehem Steel Co.*, 63 N. L. R. B. 1230, 1232, and n. 2 (1945); *Southern Colorado Power Co.*, 13 N. L. R. B. 699, 710 (1939), enf'd, 111 F. 2d 539 (CA10 1940). Whether Congress' use of that phrase indicates that it misperceived the state of the law in this re-

## III

The Court of Appeals, and the respondents here, rely on dictum in a footnote to *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267 (1974), to suggest that the 80th Congress believed that all employees with access to confidential business information of their employers had been excluded from the Wagner Act by prior NLRB decisions and that Congress intended to freeze that interpretation of the Wagner Act into law. The *Bell Aerospace* dictum is:

"In 1946 in *Ford Motor Co.*, 66 N. L. R. B. 1317, 1322, the Board had narrowed its definition of 'confidential employees' to embrace only those who exercised ' "managerial" functions in the field of labor relations.' The dis-

---

spect is not clear since the Board itself, in several instances, had used a similarly imprecise shorthand description of its practice with respect to confidential employees. See *General Motors Corp.*, 53 N. L. R. B., at 1098; *Armour & Co.*, 49 N. L. R. B., at 690; *Armour & Co.*, 54 N. L. R. B., at 1465. JUSTICE POWELL, in dissent, relying in part on the conferees' use of the phrase "outside the scope of," criticizes the Board's practice of allowing "labor nexus" employees some protections under the Act. Because we hold that the Board properly determined that neither the secretary in *Hendricks* nor the 18 workers in *Malleable* were "labor nexus" employees, we have no occasion in this case to decide the propriety of this aspect of the Board's practice. That question will be more properly addressed in a case that presents it.

Whether Congress intended to leave the Board free tò *depart* from a labor-nexus test is not entirely clear from the House Managers' statement. The statement may be read as indicating that Congress embraced the "prevailing Board practice with respect to" confidential employees. And as previously discussed, *supra*, at 178–181, the Board had consistently applied a labor-nexus test in defining confidential employees under the Wagner Act. But the declaration by the House Managers that the conferees did not intend "to alter" the Board's practice "in any respect" may alternatively be read as suggesting that Congress recognized this area as one for the exercise of Board expertise and judgment. The House Managers' suggestion that "presumably" the Board would continue its prevailing practice with respect to certain classes of employees is consistent with such a deferential reading. Because neither reading of the legislative history affords any comfort to respondents, we need not decide which is proper.

cussion of 'confidential employees' in both the House and Conference Committee Reports, however, unmistakably refers to that term as defined in the House bill, which was not limited just to those in 'labor relations.' Thus, although Congress may have misconstrued recent Board practice, it clearly thought that the Act did not cover 'confidential employees' even under a broad definition of that term." *Id.*, at 284, n. 12.

Obviously this statement was unnecessary to the determination whether *managerial* employees are excluded from the Act, which was the question decided in *Bell Aerospace.* In any event, the statement that Congress "clearly thought that the Act did not cover 'confidential employees,' even under a broad definition of that term," is error. The error is clear in light of our analysis above of the legislative history of the Taft-Hartley Act pertinent to the question. Moreover, the footnote erroneously implies that *Ford Motor Co.*, 66 N. L. R. B. 1317 (1946), marked a major departure from the Board's prior practice. To the contrary, that Board decision introduced only a slight refinement of the labor-nexus test which the Board had applied in numerous decisions from 1941 to 1946. See n. 11, *supra.* Certainly the Conference Committee, in approving the Board's "prevailing practice," was aware of the Board's line of decisions.[20]  Cf. *Cannon* v. *Uni-*

---

[20] Indeed, the Board's labor-nexus test had been brought to the attention of the Congress through the NLRB's annual reports.  See, *e. g.*, 10 NLRB Ann. Rep. 34, and n. 92 (1946).  Significantly, the NLRB's report submitted to Congress on January 3, 1947, five months before the Conference Committee Report was issued, described the Board's refinement of the labor-nexus test in *Ford Motor.*  See 11 NLRB Ann. Rep. 32, and nn. 18–21 (1947).

Citing two *1941* NLRB decisions, *E. P. Dutton & Co.*, 33 N. L. R. B. 761; *Montgomery Ward & Co.*, 36 N. L. R. B. 69, JUSTICE POWELL finds "support in the case law" for his assertion that it was Congress' understanding that the Board had previously excluded from the Act all secretaries with access to confidential information, without regard to

*versity of Chicago*, 441 U. S. 677, 696–699 (1979). Thus the only plausible interpretation of the Report is that, in describing the Board's prevailing practice of denying certain employees the full benefits of the Wagner Act, the Report referred only to employees involved in labor relations, personnel and employment functions, and confidential secretaries *to such persons.* For that, in essence, is where the Board law as of 1947 stood. It follows that the dictum in *Bell Aerospace*, and the Court of Appeals' reliance upon it, cannot be squared with congressional intent, and should be "recede[d] from" now that the issue of the status of confidential employees is "squarely presented." *NLRB* v. *Boeing Co.*, 412 U. S. 67, 72 (1973).

We also find no merit in the respondents' argument that the Board has applied the labor-nexus test inconsistently. As noted earlier, *supra*, at 178–181, the Board, in excluding "confidential employees" from bargaining units, routinely applied such a test in the six years preceding the enactment of Taft-Hartley. In the years following the passage of the Taft-Hartley Act, the Board continued to apply the labor-nexus criterion in determining whether individuals were to be excluded from bargaining units as confidential employees. In *B. F. Goodrich Co.*, 115 N. L. R. B. 722 (1956), the Board

---

labor nexus. *Post*, at 196, n. 7. The significance he would give these two cases is clearly unwarranted. *E. P. Dutton* rested explicitly on the seminal labor-nexus decision in *Brooklyn Daily Eagle*, 13 N. L. R. B. 974 (1939), to exclude three secretaries from a bargaining unit. 33 N. L. R. B., at 767–768, n. 8. And in *Montgomery Ward & Co., supra*, the Board relied in turn on *E. P. Dutton*. See *Montgomery Ward & Co., supra*, at 73, n. 6, citing *E. P. Dutton*. But whatever support JUSTICE POWELL may find in these two decisions for his understanding of Board law *in 1941*, his reading of congressional awareness is plainly erroneous; it entirely ignores congressional acceptance of the countless Board decisions between 1941 and 1947 in which the NLRB, in determining whether individuals were confidential employees excludable from bargaining units, *consistently and explicitly* required a labor nexus. See n. 11, *supra*.

reaffirmed its previous ruling in *Ford Motor* and underscored its intention "in future cases . . . to limit the term 'confidential' so as to embrace only those employees who assist and act in a confidential capacity to persons who formulate, determine, and effectuate management policies in the field of labor relations." 115 N. L. R. B., at 724 (footnote omitted) (emphasis deleted).[21] In succeeding years, while continuing to apply the labor-nexus test, the Board has deviated from that stated intention in only one major respect: it has also, on occasion, consistent with the underlying purpose of the labor-nexus test, see *supra*, at 179, designated as confidential employees persons who, although not assisting persons exercising managerial functions in the labor-relations area, "regularly have access to confidential information concerning anticipated changes which may result from collective-bargaining negotiations." *Pullman Standard Division of Pullman, Inc.*, 214 N. L. R. B. 762, 762–763 (1974); see *Triangle Publications, Inc.*, 118 N. L. R. B. 595, 596, and nn. 3–4 (1957).

In sum, our review of the Board's decisions indicates that the Board has never followed a practice of depriving all employees who have access to confidential business information from the full panoply of rights afforded by the Act. Rather, for over 40 years, the Board, while declining to create any implied exclusion from the definition of "employee" for confidential employees, has applied a labor-nexus test in identifying those employees who should be excluded from bargaining units because of access to confidential business information.[22] We cannot ignore this consistent, longstanding

---

[21] The *B. F. Goodrich* decision was apparently prompted by the fact that the Board, on several occasions following the *Ford Motor* decision, had returned to its prior practice of designating as "confidential employees" those with mere access to confidential, labor-relations information. See *Bond Stores, Inc.*, 99 N. L. R. B. 1029, 1031, n. 4 (1952); *Minneapolis-Honeywell Regulator Co.*, 107 N. L. R. B. 1191, 1192 (1954).

[22] Indeed, while it may be true that the Board's formulation of the labor-

interpretation of the NLRA by the Board. See *Bell Aerospace*, 416 U. S., at 275; *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S., at 381.

## IV

The Court's ultimate task here is, of course, to determine whether the Board's "labor nexus" limitation on the class of confidential employees who, although within the definition of "employee" under § 2(3), may be denied inclusion in bargaining units has "a reasonable basis in law." See *Ford Motor Co.* v. *NLRB*, 441 U. S. 488, 497 (1979); *Chemical Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 166 (1971); *NLRB* v. *Hearst Publications, Inc.*, 322 U. S. 111, 131 (1944). Clearly the NLRB's longstanding practice of excluding from bargaining units only those confidential employees satisfying the Board's labor-nexus test, rooted firmly in the Board's understanding of the nature of the collective-bargaining process, and Congress' acceptance of that practice, fairly demonstrates that the Board's treatment of confidential employees does indeed have "a reasonable basis in law." We therefore return finally to the disposition of the cases before us.

### Hendricks

In *Hendricks*, the Board determined that the personal secretary, Mary Weatherman, was not a confidential secretary because she "did not act 'in a confidential capacity'" with respect to labor-relations matters. 236 N. L. R. B., at 1619. While the Court of Appeals affirmed this finding, it denied enforcement of the Board's order on the basis that the evidence failed to support the Board's additional finding, required by the Court of Appeals, that Weatherman had no access to confidential *non*-labor-related information. In

---

nexus test has deviated in minor respects over the years, the refinements are of the sort that are to be expected—if not required—in the process of case-by-case adjudication by an administrative agency.

approving the Board's limited labor-nexus exclusion, we have held that such a finding is irrelevant to the determination of whether the secretary was a confidential employee. In this Court respondent Hendricks does not argue that Weatherman came within the labor-nexus test as formulated by the Board, but rather concedes that Weatherman did not have "confidential duties 'with respect to labor policies.'" Brief for Respondent Hendricks 43. Because there is thus no dispute in this respect, and in any event no suggestion that the Board's finding regarding labor nexus was not supported by substantial evidence, we conclude that the Court of Appeals erred in holding that the record did not support the Board's determination that Weatherman was not a confidential employee with a labor nexus.[23] We therefore reverse the judgment of the Court of Appeals in *Hendricks* insofar as enforcement of the Board's order was denied, and remand with directions to enter an order enforcing the Board's order.

### Malleable

In *Malleable*, as well, the respondent makes no argument that the 18 employees in question satisfy the labor-nexus test of the Board. Rather, Malleable argues, and the Court of Appeals held, that the Board should have applied a broader definition of confidential employee to include all employees in possession of confidential business information. Having rejected the broad exclusion on which the Court of Appeals' judgment relies, we reverse that judgment. But because the Court of Appeals has not yet addressed Malleable's con-

---

[23] We do not suggest that personal secretaries to the chief executive officers of corporations will ordinarily not constitute confidential employees. *Hendricks* is an unusual case, inasmuch as Weatherman's tasks were "deliberately restricted so as to preclude her from" gaining access to confidential information concerning labor relations. 236 N. L. R. B. 1616, 1619 (1978). Whether Hendricks imposed such constraints on Weatherman out of specific distrust or merely a sense of caution, it is unlikely that Weatherman's position mirrored that of executive secretaries in general.

tentions that some of the 18 employees should have been excluded from the bargaining unit for reasons entirely unrelated to whether they are confidential employees,[24] we remand *Malleable* for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, concurring in part and dissenting in part.

I concur in the Court's holding that employees in the possession of proprietary or nonpublic business information are not for that reason excluded from the NLRA as "confidential" employees. By explicitly providing for the inclusion of professional employees, the Act itself indicates that Congress did not intend such a sweeping definition of the confidential employee exclusion. But because the majority's decision "tends to obliterate the line between management and labor,"[1] a line which Congress insisted be observed by enacting the Taft-Hartley Act, I dissent from the conclusion that the confidential secretary in this litigation[2] is not a confidential employee excluded from the Act.

I

In *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267 (1974), we

___

[24] Malleable apparently seeks to argue that 13 of the challenged persons should be excluded as "managerial" employees, and that another 4 should be excluded as "supervisors." Brief for Malleable in Opposition 2, n. 1.

[1] *Packard Motor Car Co.* v. *NLRB*, 330 U. S. 485, 494 (1947) (Douglas, J., dissenting).

[2] The secretary here had worked for four years as the personal secretary to the general manager, the chief executive officer of the company. She opened his mail, typed his letters, answered the phone, and typed the minutes of meetings of the board of directors. She and the general manager shared a single office with a 6-foot partition in between their desks. She could overhear his telephone conversations when he raised his voice. She handled no labor relations materials.

held that all managerial employees were excluded from the Act regardless of whether they had a "labor nexus." In reversing the Board, the Court found that a basic purpose of the Taft-Hartley Act was to establish a sharp line between management and labor. When the Board breached this line by deeming supervisors to be "employees" within the Act, Congress responded by passing the Taft-Hartley Act with its explicit exclusion of supervisory employees. And when the Board in *Bell Aerospace* departed from its own recognition that "[i]t was the clear intent of Congress to exclude from the coverage of the Act *all individuals allied with management,*"[3] this Court responded by again requiring the Board to adhere to the dividing line between management and labor— a line fundamental to the industrial philosophy of the labor laws in this country.[4]

Indeed, it was to assure that those employees allied with management were not included in the ranks of labor that the Board originally developed the "supervisory," "managerial," and "confidential" employees exclusions from the Wagner Act. The Board recognized that employees who by their duties, knowledge, or sympathy were aligned with management should not be treated as members of labor. In the adversary system which our labor laws envision, neither management nor labor should be forced to accept a potential fifth column into its ranks. Thus, both before and after the Taft-Hartley Act, the Board excluded from bargaining units of the

---

[3] *Swift & Co.*, 115 N. L. R. B. 752, 753–754 (1956) (emphasis added).

[4] As Justice Douglas explained in his dissent in *Packard, supra:*

"The present decision [by the Court] . . . tends to obliterate the line between management and labor. It lends the sanctions of federal law to unionization at all levels of the industrial hierarchy. It tends to emphasize that the basic opposing forces in industry are not management and labor but the operating group on the one hand and the stockholder and bondholder group on the other. . . . [I]f Congress, when it enacted the National Labor Relations Act, had in mind such a basic change in industrial philosophy, it would have left some clear and unmistakable trace of that purpose. But I find none." 330 U. S., at 494–495.

rank and file, employees who like "expediters" are "closely related to management," *Friez & Sons*, 47 N. L. R. B. 43, 47 (1943), or who like assistant buyers have "interests . . . more closely identified with those of management." *Denver Dry Goods Co.*, 74 N. L. R. B. 1167, 1175 (1947). The Board has excluded employees "who formulate, determine, and effectuate an employer's policies," *AFL–CIO*, 120 N. L. R. B. 969, 973 (1958), and employees who because of their familial relation to management "are on an intimate relationship with officers of the company." *Burke Brewery, Inc.*, 54 N. L. R. B. 1061, 1062, n. 2 (1944).

The "confidential employee" exclusion and the labor nexus which the Board insists upon must be viewed as part of this larger effort to keep the line between management and labor distinct. Certainly employees with knowledge of sensitive labor relations information or "who assist and act in a confidential capacity to persons who formulate, determine, and effectuate management policies in the field of labor relations,"[5] fall on the management side of the line and should be excluded from the Act. But useful as it may be in identifying employees who are allied to management, the "labor nexus" test is but a means to this end. By its rigid insistence on the labor nexus in the case of confidential secretaries, the Board, and now this Court, have lost sight of the basic purpose of the labor-nexus test itself and of the fundamental theory of our labor laws. Thus, it makes little sense to exclude "expediters," "assistant buyers," and "employment interviewers" as managerial but include within the rank and file confidential secretaries who are privy to the most sensitive details of management decisionmaking, who work closely with managers on a personal and daily basis, and who occupy a position of trust incompatible with labor-management strife. To include employees so clearly allied to management

---

[5] *B. F. Goodrich Co.*, 115 N. L. R. B. 722, 724 (1956).

within the ranks of labor does a disservice to management and labor alike.[6]

## II

The Court's decision not only is in conflict with the basic framework of the labor laws, it also conflicts with explicit expressions of congressional intent on this subject. Congress only forbore from including an explicit provision in the Taft-Hartley Act excluding confidential secretaries because of its belief that the Board had been treating, and would continue to treat, such employees as allied to management. In discussing a proposed exclusion for confidential employees, the House Report stated:

> "Most of the people who would qualify as 'confidential' employees are executives and are excluded from the act in any event.
> "The Board, itself, normally excludes from bargaining units *confidential clerks and secretaries to such people as these.*" H. R. Rep. No. 245, 80th Cong., 1st Sess., 23 (1947) (emphasis added).

The Conference Report indicated a similar belief:

> "In the case of persons working in labor relations, personnel and employment departments, it was not thought necessary to make specific provision, as was done in the

---

[6] Just as management opposes the creation of conflicts of loyalty within its midst, neither does labor wish to represent employees who are allied to management. Thus, in *Montgomery Ward & Co.*, 36 N. L. R. B. 69, 73 (1941), for example, it was the union that sought to exclude confidential secretaries to store managers from the bargaining unit. See, *e. g.*, *Stroock & Stroock & Lavan*, 253 N. L. R. B. 447–448 (1980) ("the Employer argues the secretaries to the firm's executive committee are not confidential employees and should be included in the unit. The [union] counters that the Employer must have some confidential employees . . ."); *E. P. Dutton & Co.*, 33 N. L. R. B. 761, 766 (1941) ("Among the employees whom the Guild would exclude as confidential are three secretaries to officers of the Company").

House bill, since the Board has treated, and presumably will continue to treat, such persons as outside the scope of the act. *This is the prevailing Board practice with respect to such people as confidential secretaries as well,* and it was not the intention of the conferees to alter this practice in any respect." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 35 (1947) (emphasis added).

It was in light of these statements in the legislative history that we felt confident in *Bell Aerospace* that "'Congress could not have supposed that, while "confidential secretaries" could not be organized, their bosses could be.'" 416 U. S., at 284, quoting *Bell Aerospace Co.* v. *NLRB*, 475 F. 2d 485, 491–492 (CA2 1973).

The Court's opinion argues that the foregoing explicit legislative history is to be ignored because the express exclusion in the House bill of confidential secretaries 'was omitted in Conference. But it is clear from the language in the Reports italicized above that the omission was prompted by an understanding that the Board itself consistently had excluded "such people as confidential secretaries."[7] Indeed,

---

[7] This understanding was not without support in the case law. In *E. P. Dutton & Co., supra,* the Board excluded secretaries to officers of the company from the bargaining unit of clerical employees without any mention of a labor nexus. The Board took notice of the fact that "'[t]he nature of a personal secretary's work is such that much of the *confidential material pertaining to the management* passes through his or her hands. . . . [M]anagement should not be required to handle such material through employees in the unit represented by the union with which it is dealing.'" *Id.,* at 766–767, n. 8, quoting *Brooklyn Daily Eagle,* 13 N. L. R. B. 974, 986 (1939) (emphasis added). The Board expressed its belief that "private secretaries *should be excluded* where . . . [the union] . . . is of the opinion that *the personal and confidential relationship* existing between the private secretaries . . . and the Company's officers is such as to create a possible division of their loyalties between the management and the potential bargaining agent." 33 N. L. R. B., at 766–767, n. 8 (emphasis added). See also *Montgomery Ward & Co., supra* (secretaries of store managers excluded without reference to labor nexus).

the Members of Congress had no reason to believe that it could be argued seriously that confidential secretaries to management officials were not among the "individuals allied with management." *Swift & Co.*, 115 N. L. R. B. 752, 754 (1956). The "labor nexus," as increasingly narrowed by the Board and now accepted by this Court, is antithetical to any common-sense view or understanding of the role of confidential secretaries.

### III

Just as I would reject the Board's adherence to the labor-nexus test in the case of confidential secretaries, so, too, I would reject the Board's position that confidential employees are not excluded from the Act as a whole but only from collective bargaining. The Board urges the Court to hold that even if the secretary in this litigation was conceded to be a confidential employee, indeed, *even if she had a labor nexus*, the company still could not have dismissed her without incurring liability under the Act.

The Court wisely declines the Board's invitation. See, *ante*, at 186, n. 19. Such a holding would be a major departure from the basic philosophy of the Act. See *Packard Motor Car Co.* v. *NLRB*, 330 U. S. 485 (1947). Under such an interpretation confidential employees *with* a labor nexus might do anything in furtherance of their allegiance to labor except join the union, and the company would be powerless to protect itself. Confidential employees might join picket lines, sign petitions advocating the cause of labor, speak out against management at employee meetings, and engage in all manner of concerted activity. Even in the midst of labor-management strife, the confidential secretaries to the top managers of the company, with daily access to the company's bargaining positions, might convey confidential information as to these positions to the union, as well as take their place on the picket lines. The company would be unable to dismiss them or demote them, at least without the risk of an unfair

labor practice charge being filed. The Board developed the labor-nexus test because it recognized that "management should not be required to handle labor relations matters through employees who are represented by the union." *Hoover Co.*, 55 N. L. R. B. 1321, 1323 (1944). Neither should management be required to expose its flank to confidential employees who are overtly committed to the union or the cause of labor in all but actual membership.

The legislative history of the Act contains no support whatever for the Board's position. To the contrary, the Congress repeatedly stated its belief that in addition to supervisors certain other employees would be excluded from the Act. Thus, the Conference Report stated that "[i]n the case of persons working in labor relations, personnel and employment departments, it was not thought necessary to make specific provision . . . since the Board has treated, and presumably will continue to treat, such persons *as outside the scope of the act.*" H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 35 (1947) (emphasis added). In a generally similar context in *NLRB* v. *Bell Aerospace Co.*, 416 U. S., at 283, we said: "The legislative history strongly suggests that there also were other employees, much higher in the managerial structure, who were likewise regarded *as so clearly outside the Act* that no specific exclusionary provision was thought necessary" (emphasis added). As the majority's discussion of the legislative history indicates, the Congress viewed the confidential and managerial exemptions as akin to the supervisory exclusion. Congress considered that confidential and managerial employees, like supervisors, would be entirely excluded from the Act.

In *Bell Aerospace, supra,* at 289, we held that "'managerial employees' are not covered by the Act." The majority accepts this holding. See *ante,* at 187. Yet if managerial employees are excluded from the Act in its entirety I see no principled reason why confidential employees with a labor nexus should be treated differently.

I would reject the Board's seeming "half-a-loaf" approach to the confidential employee exclusion.[8]   As Judge Craven explained for the Fourth Circuit:

> "It strikes us as nonsense for the Board to exclude [a confidential secretary] from membership in the bargaining unit *and then* extend to her the same protection for the same concerted activity that she would have enjoyed if a union member.   If [a confidential secretary] is committed to the union cause to the extent she joins the strike by refusing to cross the picket line, it would seem to matter little to the company that she is not technically a union member.   A confidential secretary who plights her troth with the union differs in form, but not in substance, from one who holds a union card.   Since she cannot formally join the unit, there is nothing incongruous in holding that she cannot 'plight her troth' with the unit. Indeed, it seems more consistent to say that if she cannot act in concert by participating in the unit, then she cannot act in concert on an informal basis, or more accurately, that if she does so, it will be without the protection of the Act."   *NLRB* v. *Wheeling Electric Co.*, 444 F. 2d 783, 788 (1971).

Accord, *Peerless of America, Inc.* v. *NLRB*, 484 F. 2d 1108, 1112 (CA7 1973).   But see *NLRB* v. *Southern Greyhound Lines*, 426 F. 2d 1299 (CA5 1970) (assuming without discussion that confidential employees are not excluded from the Act in its entirety).

## IV

After today's decision, labor must accept into its ranks confidential secretaries who are properly allied to management.

---

[8] Of course there are limits to the power of management over its confidential employees just as there are limits to its power over its supervisory employees.   See, *e. g.*, *NLRB* v. *Talladega Cotton Factory, Inc.*, 213 F. 2d 209 (CA5 1954).

And these confidential employees, who are privy to the daily affairs of management, who have access to confidential information, and who are essential to management's operation may be subjected to conflicts of loyalty when the essence of their working relationship requires undivided loyalty. The basic philosophy of the labor relations laws, the expressed intent of Congress, and the joint desire of labor and management for undivided loyalty all counsel against such a result.